SUCCESSION OF DANIEL CLARK.—On the Application of MRS. MYRA CLARK GAINES for the Probate of the Will of DANIEL CLARK.

The rules for the opening and proof of testaments, commencing at Article 1639 of the Code, do not pronounce the penalty of nullity for their non-observance, and they nowhere say that other cases may not arise in which the strict letter of these rules may be inapplicable, and that the Judge may not receive in extraordinary cases other equally satisfactory proof that the requirements of the law have been fulfilled.

The formalities required by law for the execution of wills are essential to their validity. But whenever these forms have been observed, there is then a valid will entirely independent of its probate, or any subsequent proceedings which may be commenced on the same.

If a will is really valid, the irregular proof on which it may have been admitted to probate will not be permitted to affect the rights of parties under it. So the olographic will of *Daniel Clark* of 1811, which was admitted to probate without proof that the witnesses recognized the handwriting of *Daniel Clark* from having frequently seen him write and sign his name, as required by the old and new Code, if it had afterwards been attacked for want of this proof, would nevertheless, doubtless have been sustained on satisfactory evidence that it was entirely written, dated and signed by the testator.

The loss or destruction of the will of *Daniel Clark* of 1813, and the long period of time which has elapsed since his death, justify a resort to secondary evidence, which would not have been necessary if the will had not been lost or destroyed, and if so long a period had not elapsed before an attempt had been made to admit it to probate.

Article 1648 of the Code contemplates that the olographic will should be presented before the Judge before whom it is to be proven ; yet it cannot be seriously contended that the loss or destruction of the will could prevent the legatee from establishing the will by secondary evidence.

It is not necessary that there should be a technical *contestatio litis,* in order to give the Supreme Court jurisdiction.

The rules established by the Code for the proof of olographic wills are imperative and prohibitory, and the court is without authority to admit to probate an olographic will not proved in the manner required by the Code. (LEA, J., dissenting.)

APPEAL from the Second District Court of New Orleans, *Lea, J.*
*Smiley & Perrin, Bonford* and *Moïse & W. M. Randolph,* for *Mrs. Gaines.*
*G. B. Duncan,* for *Richard Relf.*

MERRICK, C. J.[*] In this case we adopt the carefully prepared statement of facts of the Judge of the lower court. It is in these words, viz:

"The petitioner alleges that on the 16th day of August, 1813, the late *Daniel*

---

[*] BUCHANAN, J., took no part in this decision.

**125**

*Clark,* her father, departed this life, having previously, viz: on the 13th day of
July, 1813, executed an olographic last will and testament, by which he recog-
nized her as his legitimate and only daughter, and constituted her his universal
legatee, and said bequest being subject however to the payment of certain specified
legacies, and that he appointed *François Dusuan de la Croix, James Pitot*
and *Joseph Bellechasse* the executors of said will; that said will was wholly
written, dated and signed in the handwriting of the testator, and at his death
left among his papers at his residence; that after his death diligent search was
made for the said will, but that the same could not be found, nor has it been
since, and that it was either mislaid, lost or destroyed. It is unnecessary to
recapitulate more in detail the alleged contents of the will, or to advert to the
history of events, as set forth in the petition, under which the court is called
upon to recognize this lost document as a valid testament after an interval of
more than forty years since the death of the alleged testator. The litigation,
of which the present proceeding appears to be an up-springing shoot, is incor-
porated in the jurisprudence of the country, and a reference to it will not ma-
terially assist in the solution of the question submitted for adjudication. The
petitioner asks that the will, such as she describes it, be admitted to probate,
registered, and ordered to be executed.

"To entitle the petitioner to a judgment, recognizing the existence and validity
of the will, it is necessary that she should establish affirmatively, and by such
testimony as the law deems requisite:

"1st. That *Daniel Clark* did execute a last will containing the testamentary
dispositions set forth in her petition.

"That *Clark* died without having destroyed or revoked it.

"In looking for the testimony which might solve the question whether such
a will had ever been executed or not, a reasonable inquirer would naturally
turn for information to those who were most with the deceased in the latter
part of his life, and especially (if they could be found) to those who were with
him in the last moments of his existence, when the hand of death was on him.
Such witnesses, if they had no interest in diverting his property into any par-
ticular channels, might be considered as the best and most reliable that could
be produced, and it appears to be precisely testimony of this character that the
petitioner presents in support of her application.

"It appears that *Boisfontaine* had business relations with the deceased, which
brought him into frequent intercourse with him, and that for the last two days
of his life, and up to the moment of his death, he was with him; that *De la
Croix* and *Bellechasse* were intimate personal friends, and that they were with
him shortly before his death. Now these witnesses all concur in stating that
*Clark said* he had executed a will posterior to that of 1811. They also testify
that within a few months prior to his death he was making arrangements for
the disposal of his property by a last will. He called on *De la Croix* to get his
consent to act as executor, and also as tutor to his daughter *Myra,* expressing
his intention of making generous provision for her in his will. *De la Croix*
further states that *Clark* afterwards presented to him in his (*Clark's*) 'cabinet'
a sealed packet, which he declared to be his last will, informing him at the same
time that in case of his death it would be found 'in a small black trunk which
he had there.'

"*Boisfontaine,* who was with *Clark* when he died, says that *Clark* in his last
illness spoke of executing his last will, said it was to be found in a room down

stairs, in a small black trunk; that he had left the greater portion of his property to his child *Myra;* that *Bellechasse, De la Croix* and *Pitot* were to be his executors; and that about two hours before he died he instructed his confidential servant *Lubin,* that in case of his death, the small black trunk above referred to was to be delivered to *De la Croix,* and enjoined upon him, as soon as he (*Clark*) was dead, to be sure and take it to him. He states that *Clark* expressed his satisfaction that he had provided for his daughter *Myra,* leaving her all his estate, and that *De la Croix* had consented to act as her tutor. He also states that he was present about fifteen days before *Clark's* death, when *Clark* took from the small black case a sealed package, and presented it to *De la Croix,* stating that it was his last will, recapitulating some of its provisions, and reminding him of his promise to act as tutor to his daughter. He further states that several persons, shortly before *Clark's* death, had seen the will, and corroborated *Clark's* statement as to its contents, and that *Judge Pitot, Lynd,* the notary, the wife of *William Harper* and *Bellechasse* were among the persons referred to. Now," the Judge *à quo* proceeds, "I think there can be no doubt, setting aside the testimony of *Bellechasse* and *Mrs. William Harper,* that *Clark* did execute a will shortly before his death; that the principal object of making this will was to recognize as his daughter the present applicant, and to make suitable provision for her; that the executors of this will were *Pitot, Bellechasse* and *De la Croix,* and that *De la Croix* was appointed tutor of his daughter *Myra;* that this will must have been in existence until within a very short time previous to *Clark's* death, if not after that event, and that *Clark* himself died believing it was in existence.

"That such was the opinion of *De la Croix* himself at the time is evident from the fact that twenty-four hours had scarcely elapsed after the probate of the will of 1811 before he made oath that he verily believed that *Daniel Clark* had made a 'testament posterior to that of 1811, that its existence was known to several persons,' and he accordingly applied for and obtained an order of the court commanding every notary in the city to declare whether such document had been deposited with him.

"If the foregoing facts may be considered as proved, independent of the testimony of *Bellechasse* and *Mrs. William Harper,* the additional testimony of these last named witnesses, with reference to the form of the execution of the will and its contents will rest upon a basis of probability, which must strengthen if it does not anticipate its conviction of its truth, for it is to be remembered that *Clark* knew how to draw an olographic will in due form, having already done so in the execution of the previous will, and knowing what was necessary to its validity, it would be improbable in the extreme that he would omit any of the few necessary formalities.

"When *Bellechasse* and *Mrs. Harper,* therefore, testify directly to the execution of the will, as having been written, dated and signed in the proper handwriting of the testator, they testify to the existence of facts which are, at least, probable, and upon the assumption that the will was executed, are matters approaching to certainty, independent of their testimony; so with regard to the appointment of executors, of the tutor, and of the general dispositions of the will as described in the petition.

"They state *Clark* did what he told others he intended to do, and what from the whole tenor of his conduct it was very probable he would do.

"It does not appear, however, that all the contents of the will, as sworn to
by *Mrs. William Harper*, are also sworn to by *Bellechasse*, and though the tes-
timony of the latter does not contradict that of the former, but confirms it, yet
his testimony does not relate to any portions of the will, except such as relate
to its form, the institution of his daughter as universal legatee, and the appoint-
ment of *De la Croix*, *Pitot* and *Bellechasse* as executors. Indeed the examina-
tion of witnesses does not appear to have been conducted with any reference
to a detailed description of the will.

"They, however, both state distinctly that they read the will; that it was
wholly written, dated and signed by *Clark;* that he thereby instituted *Myra
Clark*, his daughter, his universal legatee, and appointed *De la Croix*, *Pitot*
and *Bellechasse* his executors. From an examination of the whole testimony,
and considering the conduct of the deceased, his repeated declarations up to
the very day of his death, together with his anxiety to make ample provision
for his daughter," the Judge of the lower court adds, "I feel satisfied that the
legal presumption (which in the case of a lost will would necessarily exist) that
it was destroyed or revoked by the testator must be considered as satisfactorily
rebutted."

In addition to the statement of facts and conclusions in regard to them of the
Judge of the lower court, it may be remarked that *De la Croix* states that the
endorsement upon the will which he saw sealed up were in these words: "Pour
être ouvert en cas de mort." This indorsement does not appear upon the will
of 1811, and the will which he saw was doubtless the will of 1813.

In regard to the testimony of *Col. Bellechasse* and *Mrs. William Harper*,
there is nothing in this record which impeaches their credibility. If it be ob-
jected that the amount of property left by *Clark* may have induced them to
swerve from the truth, the reply has equal force that there would be just as
strong a reason for any other party in interest to have prevented the execution
of the will by its destruction.

It may be remarked further, that the universal legacy being established be-
yond question, the particular legacies which tend to diminish the estate which
will come into the hands of this universal legatee are sufficiently proved on
general principles against such legatee by the testimony of a single witness;
because these legacies are alleged and set up in the petition of the party who
is to be charged with them, and she cannot be permitted afterwards to deny
what she has alleged in her pleadings.

Agreeing fully, as we do, with the conclusions arrived at by the District
Judge as to what has been proven, the only remaining question for us to solve
is one of law, and it is: Has this will been proven in conformity to Article No.
159, p. 244, of the Old Code or of Article No. 1648 of the New Code, which
require for the proof of the olographic will the testimony of two credible wit-
nesses, who declare that they recognize the testament as being entirely written,
dated and signed in the testator's handwriting, as having often seen him write
and sign during his lifetime?

The witnesses have sworn that the will was entirely written, dated and signed
by *Daniel Clark*, but they nowhere say that they have often seen him write.
They show an intimacy and relationship which leaves little room to doubt that
they really were well acquainted with his handwriting, and had probably seen
him write often, as required by the Code, but they have not expressly said so.
The question can, therefore, be answered only by determining whether the

provisions of law contained in this Article of the Code are sacramental, and must be pursued in all cases, or whether they are merely directory, and the courts have power, in certain cases where this proof is wanting by reason of accident, to avail themselves of the secondary proof, the next best of which the nature of the case will admit.

It would seem that there was a distinction between rules of law which prescribe the form in which wills and testaments are to be made and those which direct the courts in what manner they shall be admitted to probate and ordered to be executed. The first, commencing at Article 1567 of the Civil Code, are positive enactments which are essential to the validity of the will. Their non-observance renders the supposed will null and void by express provision of law. C. C., 1588. The rules, on the other hand, which are sketched by the Legislature for the opening and proof of testaments, commencing at Article No. 1639, do not pronounce the penalty of nullity for their non-observance, and they nowhere say that other cases may not arise in which the strict letter of these rules may be inapplicable, and that the Judge may not, in extraordinary cases, receive other equally satisfactory proof that the requirements of the law have been fulfilled.

In a nuncupative will by public act it is required that certain formalities should be observed before a notary public and three witnesses. Without these observances the will would not exist as such.

The olographic will must be entirely written, dated and signed by the testator. Without the observance of these requirements there is no legal will.

And so of the other forms. But whenever these forms have been observed, there is then a valid will entirely independent of its probate or any subsequent proceeding which may be commenced upon the same. But the law says that this valid will shall remain inoperative until it receives the order for its execution by the Judge of the probate court. But it has never been pretended that this validity of the will is in any manner effected by the character of the proof which the Judge of the lower court may deem sufficient on which to base his order. If the will is really valid, the irregular proof on which he may base his decree cannot render it invalid. The will subsists, and though the judgment might be corrected on appeal, yet, if it were suffered to remain, the courts would never permit a party to lose his rights by a mere irregularity in the proof upon which the decree was founded. *Falkner* v. *Friend*, 1 Rob., 48.

So in the case before us, the will of 1811 was admitted to probate by *Judge Pitot*, upon the single declaration of the witnesses "that the same was in the proper handwriting of him, the said *Daniel Clark*." No one will pretend that this will was rendered invalid because those witnesses did not swear that they had often seen *Daniel Clark* write. Had the will afterwards been attacked on the ground that the will was not in the handwriting of *Daniel Clark*, it would doubtless have been sustained on satisfactory proof that it was entirely written, dated and signed in the handwriting of the testator.

The distinction which we have drawn between the positive enactments of law in regard to the form for the execution of wills and the directory provisions in regard to the proof of the same, seems to have been fully recognized by our predecessors. In the case of *Bonthemy* v. *Dreux et als.*, 12 M. R., p. 639, the court maintained a nuncupative will by private act which had been admitted to probate on the testimony of a single witness, notwithstanding Article No. 189, p. 244 of the Old Code. This distinction was also taken in the case

of the *Succession of Robert, Pilié, Executor*, 2 Rob., 433; also, in effect, in the case of the *Succession of Eubanks*, 9 An., 147, where a witness was admitted to testify who did not possess the qualifications required by Article 1584 of the Civil Code.

This distinction also pervades the jurisprudence of France on this subject. By Article No. 1007 of the Code Napoleon it is made the duty of the Judge to make a proces verbal of the presentation of the olographic will, the opening of it, the state in which he found it, and the order of deposit with the notary. These provisions appear to be directory only. Pailliet, Note 2 to Article 1007 C. N., says: "La présentation du testament au président du tribunal, l'ouverture des testaments par ce magistrat, et le procès verbal qu'il doit dresser ainsi que de l'état du testament, sont sans contredit des précautions que la loi a cru nécessaires, pour qu'on pût être assuré de plus en plus de la volonté des testateurs; mais la loi n'a point attaché à l'inobservation de ces formalités de peine de nullité, et on ne saurait la prononcer, surtout lorsque rien n'indique la fraude de la part de l'héritier institué ou du légataire." See note and authorities there cited.

Taking it, therefore, for granted that the distinction which we have indicated exists, the next question which presents itself is, do the circumstances of this case take it out of the rule prescribed by Article No. 1648 of the Civil Code? We think the loss or destruction of the will, after the death of *Clark*, and the long period of time which has elapsed since his death, justify a resort to secondary evidence, which would not have been necessary if the will had not been lost or destroyed, and if so long a period had not elapsed before an attempt had been made to admit it to probate. We think this view of the law is fully sustained both by reason and authority.

Article 1648 contemplates that the olographic will shall be presented before the Judge before whom it is to be proven; yet no one would seriously contend that the calamity which deprived the legatee of the will would prevent him from establishing its contents by secondary evidence. Were this the law, a reward would be offered to villainy, and it would always be in the power of the unscrupulous heir to prevent the execution of the will.

The case of *Thomas et al.* v. *Thomas*, 2 L. R. 166, was a controversy in regard to a lost will which, it had been alleged, had already been admitted to probate. The objection to the proof was:

"That parol proof of the execution of the will could not be given in that court; that a will, being an instrument clothed with certain formalities prescribed by law in order to give it effect, no evidence of its loss or its contents could be offered until its existence with the requisite formalities had been proved."

Judge Porter, as the organ of the court on this point, remarks with his usual felicity:

"The first objection is entitled to more consideration, but we still believe it unsound. The law of evidence would have a poor claim to the praise justly bestowed on it if it did not foresee and provide for such a case as this. That rule which is the most universal, namely: that the best evidence the nature of the case will admit shall be produced, decides the objection, for it is only another form of expression for the idea that when you lose the higher proof you may offer the next best in your power. The case admits of no better evidence than that which you possess, if the superior proof has been lost without your

fault.  The rule does not mean that men's rights are to be sacrificed and their property lost because they cannot guard against events beyond their control. It only means, that so long as the higher or superior evidence is within your possession, or may be rendered by you, you shall give no inferior proof in relation to it.  Particular rules, which require written proof, always relax themselves to meet absolute necessity, or that necessity which is occasioned by occurrences common among men.

"There is nothing in a will being required to be made in a particular form, which makes it an exception to this great law of necessity.  It may increase the difficulty of proof, but furnishes no reason to refuse hearing it.  The court in this case had proof before them, which much diminished the danger of parol evidence."

In the case of the *Succession of Maria J. Robert, Pilié, Executor*, 2 Rob., 434, which was a contest growing out of an olographic will executed in France, and there deposited, the proof was by witnesses who were acquainted with the handwriting of the testatrix.  It does not appear that they had often seen her write.

The court, after holding this sufficient as being all which was required by the law of France, says:

"It has been insisted, however, that Article 1648 and 1649 of our Code show that the original will ought to be produced in order to be identified with the testimony of the witnesses who have recognized it, and that in its absence the evidence would be incomplete.  This position would perhaps be correct if the witnesses were in personal attendance before the court of probate.  But these Articles are not negative laws; they do not say that no other kind of proof shall be admitted, and we doubt very much whether, under their application, if an olographic testament, executed here, had by some accident been destroyed before being legally proved, a true copy of it, identified with the original by the testimony of two credible witnesses who had seen both, and who would be able to swear to the genuineness of the original in the manner pointed out by law, should not be considered as sufficient compliance with the provisions of our Code.  Surely we are not prepared to say that in such a case the legal rights acquired under the will would also be defeated, and that the party would be left without a remedy.  This is indeed an analogous and even stronger case, and as in our opinion the law-makers cannot have intended to require an impossibility, we must conclude that, under such circumstances, the proof furnished by the appellants is a sufficient compliance with the requisites of the Codes, and that the inferior Judge did not err in ordering the execution of the will under consideration."

In view of these decisions of our own courts in regard to the construction of Article No. 1648, it is not necessary to examine the decisions of the court on analogous articles of the Civil Code and the Code of Practice in order to arrive at a conclusion on this.

The doctrine of the common law is in consonance with this view taken by our own courts.  The books are filled with adjudged cases in regard both to lost deeds and wills.  We will content ourselves by citing one: the case of *Dare* v. *Brown*, 4 Cowen, 469.  The suit was brought upon a lost will devising real estate.  By the statute laws of New York, a will devising real estate was required to be proved by three credible witnesses.  The Supreme Court of New York says, in regard to this lost will:

"The will of *Benijah Brown* was proved by one of the subscribing witnesses. He stated it was executed in the presence of himself, *James Walton*, and another person whose name he did not recollect, but he had no doubt of his being a credible witness. This," the court adds "was all the evidence which could be expected under the circumstances of the case."

Considering that the administration of justice requires something more than the application of the letter of the law designed for one class of cases of ordinary occurrence to all others, however they may have been modified by accident, and believing that the spirit of our laws provides for the case which the applicant has presented us, we conclude that the will of 1813, such as she has set forth in her petition, should be admitted to probate.

It has been objected (as we understand the argument) that this court has no jurisdiction of this case on appeal, under the Constitution, because there is no *contestatio litis* formed, and because there are no proper parties to the appeal. We dismiss this objection with the single observation, that it is not necessary under the Constitution that there should be a technical *contestatio litis* in order to give this court jurisdiction, and if the attorney of absent heirs was even necessary as a party, his presence here is sufficient to sustain this appeal.

We are not insensible to the argument that this claim has remained for forty years, without being set up in a court of justice in a form to be prosecuted to effect, and that rights have been acquired under the sales made under the will of 1811. The staleness of petitioner's suit is best answered by the reference to the litigation in which petitioner's alleged rights have been prosecuted in other forms, and we may suppose it did not become necessary to resort to the unusual proceeding of applying for the probate of a last will until after those cases were decided.

The plaintiff presents to us a *prima facie* case which entitled her to relief. The decision which we make does not conclude any one who may desire to contest the will with her in a direct action, and to show that no such will was executed. On the other hand a refusal to probate the will places it beyond the power of the applicant to set up her rights under the will against any other person.

It is, therefore, ordered, adjudged and decreed by the court, that the judgment of the lower court be avoided and reversed, and proceeding to render such judgment as should have been rendered in the lower court, it is ordered, adjudged and decreed, that the will of *Daniel Clark*, dated New Orleans, July 13th, 1813, as set forth in the plaintiff's petition be recognized as his last will and testament, and the same is ordered to be recorded and executed as such, and it is further ordered, that *François Dusuan de la Croix* be confirmed as testamentary executor of said last will and testament, and that letters testamentary issue to the said *De la Croix*, and that the costs of this proceeding be borne by the succession.

LEA, J., (dissenting.) The able and carefully-prepared opinion of the Chief Justice has failed to convince me that the document purporting to be the last will and testament of *Daniel Clark* should be recognized as such. This case turns principally upon the solution of a legal proposition, which has been correctly stated in the opinion which has been read—to wit: Whether the provisions of our Code in relation to the proof of wills "are merely directory," and "the courts have power, in certain cases where the required proof is wanting, by reason of accident, to avail themselves of secondary proof—viz., the next best

of which the nature of the case will admit." It is urged, and the decree of the court has decided, that a distinction is to be drawn between the law regulating the execution of wills, and that which prescribes the manner of proving them. For instance, the law is imperative that an olographic will should be dated, and it is conceded that no amount of testimony, however conclusive, both as to the fact and even the precise date of its execution, will supply the want of a date ; but the same law, though in a different article, has declared that an olographic will must be proved by two witnesses, who possess certain qualifications, and who derive their knowledge from a particular source. This part of the law, *it is decided*, is not imperative, but directory, and is subject to the application of the ordinary rule of evidence—viz.: that when the best evidence is not attainable, the next best may be resorted to. A single remark made by the organ of the court with reference to the proof of the will of *Maria J. Robert*, (see 2d Rob., p. 432,) appears to be the basis upon which much of the reasoning in this case rests. The court remarked in that case that Articles 1648 and 1649 were not negative laws; but an examination of the case shows that this remark had no necessary logical connection with the conclusion at which the court arrived. The decision in that case I have no doubt was correct, not because these articles were not negative in their character, but because in the nature of things, so far as they were dispensed with, they had no application to the case in hand. One of the parties was seeking to prove a will registered in France—the laws of that country prohibiting a removal of the original. It was held that that portion of the articles referred to which required the production of the will was not applicable.

It was in this connection that the learned judge who rendered the opinion made the remark that these articles were not negative ; but no such proposition was necessary to his conclusion. It appears to me that it was a case in which a negative law was not applicable. So in the case of *Eubank*, recently decided, which is quoted by the Chief Justice as being one " wherein a witness was permitted to testify who did not possess the qualifications required by Article 1584 of the Civil Code." The only question was, whether a woman could be one of the witnesses to prove an olographic will. It was held that she might be, and that Article 1584, which prescribes that no woman shall be a witness to a will, has reference exclusively to subscribing witnesses, but had no application to the proof of olographic wills. I have examined the decision with care, and I have entirely misunderstood it if either the learned judge who wrote it, or the court which assented to it, intended to sanction the doctrine that a witness should be permitted to testify who did not possess the qualifications required by law. Again, the case of *Thomas* v. *Thomas*, referred to, was one in which the ordinary rules of evidence regulated the proof of the contents of a lost will, but an examination of the case shows that it had nothing to do with the probate of a will.

In a question involving title, proof was offered, not to have a will probated, but to establish the contents of a will *which had been probated*, and which, after its probate had been lost in the parish judge's office, it was held that such a case was to be regulated by the ordinary rules of evidence. No question was presented with reference to the substitution of those rules for the positive provisions of the Code. Without entering into a more protracted examination of the cases referred to, I may be permitted to say that in none of them, in which the pleadings call for it, have I found a recognition of the doctrine that the articles

of the Code regulating the proof of wills could be set aside or dispensed with, as not being imperative and prohibitory. And were it otherwise, I should consider the doctrine one which no precedent could consecrate. Laws, whether directory or prohibitory, are alike entitled to obedience; different consequences may attach to the violation of these laws, but though cases may occur to which they are not applicable, laws can never be dispensed with except by a power which is above the law, or one which violates it. Now, it appears to me that the character and meaning of the law may be determined by a reference to its object. If the object of the law in reference to the proof of wills was to regulate the measure of evidence only in cases where that measure was attainable, then it is evident that it is mere surplusage. A law which prescribes that a certain amount of proof shall be required to establish a will, provided the applicants can produce it; and if they cannot procure it, that they may proceed to prove it in any other manner which may be satisfactory to the magistrate, carries within itself an inherent nullity. It would be operative only when it was useless, and would cease to be operative upon the first attempt to give it a practical effect.

The article referred to in this case, therefore, is not only negative, but negation is of its very essence; deprive it of its negative character and it ceases to be a law at all—it exists only as it prohibits. When the law, therefore, says that the olographic will must be proved by *two witnesses*, it means, as it appears to me, that *one* witness shall *not* prove it; and so with regard to every other provision applicable to the case presented. If any party in interest should appear before us on an appeal from a decree of a probate court admitting a will to probate upon the testimony of one witness, I apprehend that we should have very little hesitation in reversing the decree, no matter how well it might be fortified by proof that it was impossible to obtain two witnesses, or that witnesses who might have proved it were dead. I think we should say, in such a case, that the article *was* prohibitory, and that the ordinary rules of evidence were not applicable and could not be substituted for the positive statutory provisions of the Code.

If, then, the article of the Code is imperative and prohibitory, as I think it is, it is the duty of the magistrate to whom a will is offered for probate to see that the requirements of the law are complied with. If it is an olographic will which is offered for probate, it is his duty to require that it shall be proved by two witnesses who recognize the document as being wholly written, dated and signed by the testator; and the knowledge of this fact they must have acquired from having frequently seen him write and sign his name. And it appears to me that the magistrate receiving the proof of the will cannot dispense with any of these requirements without an omission of duty. Having considered the general rules regulating the proof of wills, it remains to be determined how far the case presented furnishes such an exception as to justify a departure from their ordinary application. It is admitted—and on this point there is no division of opinion—that in no part of the testimony is it stated that either of the witnesses ever saw *Clark* either write or sign his name; but it is urged that this being the case of a lost will, the rules regulating the proof of testaments not lost are not applicable.

So far as the articles of the Code were not intended to apply to such a case as that presented, they of course cannot be invoked or enforced.

When the law, therefore, refers to the production of a will, the case of a lost will, so far as it relates to its production, is not contemplated, any more than in a provision referring to the presence of witnesses in court reference can be supposed to be had to a case where the witnesses are dead or absent. Acting upon this reasonable doctrine, the inferior court allowed proof to be offered of the fact that a document purporting to be a last will and testament of *Daniel Clark* had been either lost or destroyed, and also proof of the contents of the document supposed to be lost. The recorded testimony of witnesses long since dead was received in evidence both as to the character and contents of this document. All that the dead had sworn to, and all that the living could swear to, was received without objection. If more testimony was not received it was because no further testimony was attainable; but upon a consideration of the whole of it the court thought, perhaps erroneously, that the proof did not meet the requirements of the law. The inferior court considered that, without assuming that to have been proved which it is admitted was not proved, it had no authority to admit the will to probate ; and it is because (as it appears to me) this court has assumed that the witnesses, if they could be brought to life, would swear to what they have not sworn to; would give testimony beyond what they had already given; would, in fact, give a particular answer to a particular question that I feel compelled to dissent from the opinion which has been rendered.

I have endeavored to show, that if the witnesses were alive, it would be the duty of the court to inquire into the particular sources of their knowledge of *Clark's* handwriting. Now, in my opinion, the court was not authorized to assume that an answer to the question whether they had frequently seen *Clark* write, would have been an affirmative one. For a legal inference, the court was not, it appears to me, authorized to travel beyond the record, and as a mere deduction of fact, it, by no means, follows that familiarity with *Clark's* handwriting and signature must have been based upon the fact that they had ever either seen him write or sign his name.

Every person who has been called upon frequently to receive the proof of wills, and indeed every person who has had occasion to examine frequently the handwriting of different persons, must recognize it at once, as within his personal experience, that such knowledge of one's handwriting is often acquired in a manner to enable any one to swear to it with all reasonable certainty, without ever having seen the writer put pen to paper. It is not my purpose to elaborate this point or to extend my remarks beyond what may be considered necessary to a statement of the views upon which my dissent is placed. I withhold my concurrence in the decree which has been rendered, because, in my opinion, it substitutes conjecture for certainty in proceedings in which, above all others, neither assumption nor conjecture are admissable.