## Case No. 5,175.

### GAINES v. LIZARDI et al.
### FUENTES et al. v. GAINES.

[3 Woods, 77;[1] 9 Chi. Leg. News, 305.]

Circuit Court, D. Louisiana. April Term, 1877.

W. R. Mills, for Myra Clark Gaines.

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

James McConnell, for Joseph Fuentes,

BILLINGS, District Judge. The full argument of counsel, occupying seventeen entire days and an examination of the records, have satisfied me that the various decisions rendered by the supreme court of the United States have concluded me upon very many of the questions of law which have been presented. I shall first consider the suit for the revocation of the probate of the will.

The supreme court of the United States in their opinion pronounced in this case (Gaines v. Fuentes, 92 U. S. 10), in order to determine whether it was removable from the state to the United States court, has defined its nature and has characterized it as follows: "The action cannot be treated as properly instituted for the revocation of the probate, but must be treated as brought against the devisee by strangers to the estate to annul the will, as a muniment of title and to restrain the enforcement of the decree by which its validity was established, so far as it affects their property."

It is a suit which was instituted as an adjunct and means of defense to the numerous other suits for the recovery of real estate in which the complainant rested her title upon a will, the substantial allegation being that the will was admitted to probate upon false and insufficient testimony. It has now been cumulated with these other actions. It is therefore to be viewed and tried as if it were a pleading in these other actions, presenting the issue devisavit vel non. It presents the broad question, was there a will, unfettered by the restrictions of the Code relating to actions to annul the probate of wills? Before considering the cause upon the merits, I will dispose of the plea of prescription of five years. Civ. Code, art. 3540 (3505), provides as follows: "That actions for the nullity or revision of contracts, testaments or other acts are prescribed by five years."

I think this article refers to actions brought against parties who are in possession under a will, and that it has no application to a will invoked as here, by a party out of possession as a muniment of title against those in possession not claiming under the same will, and that whenever by and against such parties a will is relied upon to establish a link in the chain of title it may be attacked. I think, therefore, the plea should be overruled.

The other exception, viz., that the plaintiffs (complainants), Fuentes et al., could not maintain their actions, as strangers to the estate of Daniel Clark, is disposed of by the fact that in the supplemental petition they claimed to have derived title from Relf and Chew, executors, or as attorneys in fact of Myra Clark, universal legatee, under the will of Daniel Clark, known as the "Will of 1811;" and by the further fact that the consideration of this case with the others renders the petition or bill of complaint in this action in effect a plea interposed in the others, which may be termed direct actions.

This brings me to the question: Was there, according to the evidence presented before me, a will? Has the will of 1813 been established before me as an instrument executed by Daniel Clark, and clothed with the requisite formalities of a last will and testament according to the laws of Louisiana? It is urged by the complainants, Fuentes and others: 1. That the proces verbal which entitles this will to be received as a probated will is wanting. 2. That the will as probated is not shown to have been dated, and thus does not, in that respect, comply with the requirements of the law in respect to olographic wills. 3. That the evidence disproves, or fails to prove, that such a will ever existed; and, 4. That if such a will was ever executed, since it was not found after the death of the testator, the presumption of law is, that it was destroyed by the testator animo cancellandi, and that this presumption has not been rebutted by the proofs.

1. As to the absence of the proces verbal. Articles 492, 493, Code Pr., give the textual provisions of the law as to what the proces verbal shall contain; but it is clear they cannot, with the exception of that provision which relates to the order for executing and recording the will, apply to wills, which, as in this case, are lost.

The reasoning of the supreme court of Louisiana, and their decree in which they order the recording and execution of this identical will without any such proces verbal, and when in the nature of things no such recital as is pointed out in the requirements of the Code of Practice before referred to could exist, is an authoritative decision upon the law of Louisiana on this point. Succession of Clark, 11 La. Ann. 125. Judge Lee, sitting as a probate judge, while finding the proofs sufficient to establish the will, decreed against its being admitted to probate on the ground that the proof was not, in manner and form, such as the statute required. There was, therefore, no probate of the will in the lower court, but on appeal the supreme court reversed the decree and ordered the will executed. What they did in that case is a practical construction of the law upon the point as to how a lost will may be probated, and of its admissibility when so probated.

The second objection: "That the will is not shown to have been dated." Article 1588 (1581), Civ. Code, declares "an olographic will shall be enirely written, dated and signed by the hand of the testator." On this point of date the testimony adduced before me is precisely the same as that before the supreme court of Louisiana at the time the will was probated. They found it sufficient —that is—they must have found that the will was dated; that the year, month and date were written by the testator.

Again, the two witnesses who read the will were Mrs. Smythe and Mr. Bellechasse. Mrs. Smythe, at page 141, probate record, in answer to the twenty-sixth interrogatory, says: "The whole of this will was in Mr. Clark's handwriting; it was dated and signed by Mr. Clark at the time I read it." At page 143, in answer to the thirty-second interrogatory, she says: "It was dated in July, 1813." Belle-chasse. at page 162, probate record, says in answer to interrogatory twelve:

"The last will of Clark, to wit, the will of 1813, was legal in form because it was written wholly in his (Clark's) handwriting, and was dated and signed by him." These witnesses both testify that the will was dated, and one of them adds, "it was dated in July, 1813." The fair meaning of their language is that it bore the year, month and day; and the meaning of the language of Mrs. Smythe, that it bore date on a particular day of July, Anno Domini 1813..

If a jury had found a special verdict that the will bore date on some day in July, 1813, though they did not specify what day, so long as being in July, left it the last will of Clark, would not a court be bound to give judgment that the will was dated? And the testimony of these two witnesses, uncontradicted, is on this point equivalent to a special verdict. It is proven that the will bore date on some one of the days in July, 1813, and this is sufficient.

The third objection, that the evidence dis-proves, or fails to prove, that this will ever existed; and, fourth, that if it was ever exe-cuted, since it was not found after the death of the testator, the presumption of law is that it was destroyed by him for the purpose of canceling, and that this presumption has not been rebutted.

The testimony which has been read before me is in almost all respects identical with that adduced before the supreme court of Louisi-ana (Succession of Clark, 11 La. Ann. 125, 126, 127), and is there stated with clearness and fairness by Judge Lee and by the su-preme court, as follows:

"In looking for the testimony which might solve the question whether such a will had ever been executed or not, a reasonable in-quirer would naturally turn for information to those who were most with the deceased in the latter part of his life, and especially (if they could be found) to those who were with him in the last moments of his existence, when the hand of death was on him. Such witnesses, if they had no interest in divert-ing his property into any particular channel, might be considered as the best and most reliable that could be produced, and it ap-pears to be precisely testimony of this char-acter that the petitioner presents in support of her application.

"It appears that Boisfontaine had business relations with the deceased, which brought him into frequent intercourse with him, and that for the last two days of his life. and up to the moment of his death, he was with him; that De la Croix and Bellechasse were intimate personal friends, and that they were with him shortly before his death. Now, these witnesses all concur in stating that Clark said he had executed a will pos-terior to that of 1811. They also testify that within a few months prior to his death he was making arrangements for the disposal of his property by a last will. He called on De la Croix to get his consent to act as ex-ecutor, and also as tutor to his daughter Myra, expressing his intention of making a generous provision for her in his will. De la Croix further states that Clark afterwards presented to him in his (Clark's) cabinet a sealed packet which he declared to be his last will, informing him at the same time that in case of his death it would be found in a small black trunk which he had there.

"Boisfontaine, who was with Clark when he died, says that Clark in his last illness spoke of executing his last will; said it was to be found in a room down-stairs in a small black trunk; that he had left the greater portion of his property to his child, Myra; that Bellechasse, De la Croix and Pitot were to be his executors, and that about two hours before he died he instructed his confidential servant, Lubin, that in case of his death the small black trunk above referred to was to be delivered to De la Croix, and enjoined on him, as soon as he (Clark) was dead, to be sure and take it to him. He stated that Clark expressed his satisfaction that he had provided for his daughter Myra, leaving her all his estate, and that De la Croix had con-sented to act as her tutor. He also states that he was present about fifteen days be-fore Clark's death, when Clark took from the small black case a sealed package and presented it to De la Croix, stating that it was his last will, recapitulating some of its provisions, and reminding him of his prom-ise to act as tutor to his daughter. He fur-ther states that several persons, shortly be-fore Clark's death, had seen the will, and corroborated Clark's statement as to its con-tents. and that Judge Pitot, Lynd, the no-tary, the wife of William Harper and Belle-chasse were among the persons referred to."

"Now," the judge a quo proceeds, "I think there can be no doubt, setting aside the tes-timony of Bellechasse and Mrs. Wm. Har-per, that Clark did execute a will shortly be-fore his death; that the principal object of making this will was to recognize as his daughter the present applicant, and to make suitable provision for her; that the execu-tors of this will were Pitot, Bellechasse and De la Croix, and that De la Croix was ap-pointed tutor of his daughter Myra; that this will must have been in existence until death, if not after that event, and that Clark within a very short time previous to Clark's himself died believing it was in existence.

"That such was the opinion of De la Croix himself at the time, is evident from the fact

that twenty-four hours had scarcely elapsed after the probate of the will of 1811, before he made oath that he verily believed that Daniel Clark had made a testament posterior to that of 1811, and its existence was known to several persons, and he accordingly applied for and obtained an order of the court commanding every notary in the city to declare whether such document had been deposited with him."

If the foregoing facts may be considered as proved, independent of the testimony of Bellechasse and Mrs. Wm. Harper, the additional testimony of these last named witnesses, with reference to the form of the execution of the will and its contents, will rest upon a basis of probability, which must strengthen if it does not anticipate the conviction of its truth, for it is to be remembered that Clark knew how to draw an olographic will in due form, having already done so in the execution of a previous will, and knowing what was necessary to its validity it would be improbable in the extreme that he would omit any of the few necessary formalities.

When Bellechasse and Mrs. Harper, therefore, testify directly to the execution of the will, and having been written, dated and signed in the proper handwriting of the testator, they testify to the existence of facts which are, at least, probable, and upon the assumption that the will was executed, are matters approaching to certainty independent of their testimony; so with regard to the appointment of executors, of the tutor, and of the general dispositions of the will described in the petition.

They state that Clark did what he told others he intended to do, and what, from the whole tenor of his conduct, it was very probable he would do.

It does appear, however, that all the contents of the will as sworn to by Mrs. William Harper, are also sworn to by Bellechasse, and though the testimony of the latter does not contradict that of the former, but confirms it, yet his testimony does not relate to any portions of the will, except such as relate to its form, the institution of his daughter as universal legatee, and the appointment of De la Croix, Pitot and Bellechasse as executors. Indeed, the examination of witnesses does not appear to have been conducted with any reference to a detailed description of the will.

They, however, both state distinctly that they read the will; that it was wholly written, dated and signed by Clark; that he thereby instituted Myra Clark, his daughter, his universal legatee, and appointed De la Croix, Pitot and Bellechasse his executors. From an examination of the whole testimony, and considering the conduct of the deceased, his repeated declarations up to the very day of his death, together with his anxiety to make ample provision for his daughter, the judge of the lower court adds: "I

feel satisfied that the legal presumption (which in the case of a lost will would necessarily exist) that it was destroyed or revoked by the testator, must be considered as satisfactorily rebutted."

In addition to the statement of facts and conclusions in regard to them of the judge of the lower court, it may be remarked that De la Croix states that the indorsement upon the will which he saw sealed up was in these words. "Pour être ouvert en cas de mort." This indorsement does not appear in the will of 1811, and the will which he saw was doubtless the will of 1813.

The chief testimony offered by the complainant Fuentes in addition to that which is there offered, is the testimony of Mazureau's probate record, page 432, and the answers of Relf and Chew. Mazureau's letter, cannot, in my opinion, be received as evidence. It is simply a statement in writing of a person not a party to, or a witness in these causes or in any cause, and not under oath, and I know of no principle of evidence upon which it is admissible. The answers of Relf and Chew are an emphatic denial, but they do not outweigh the force of the direct and circumstantial evidence in favor of the execution of this will. In this connection I will consider the testimony of Mr. Brown, which is urged to invalidate that of Mrs. Smythe, and the letter of Bellechasse to Mr. Cox, as tending to show uncertainty in his recollection of the terms of the will. Mr. Brown testifies that Mrs. Smythe visited in his family during the summer after Mr. Clark's death; that she spoke often and most particularly about his death and estate, and never referred to the will of 1813. If these statements are to be considered as properly in evidence, they are to be considered as urged against the witness, to whose attention they were never called, and who, therefore, never had an opportunity to explain, or by other testimony rebut them. Mrs. Smythe was evidently attached to Myra, now Mrs. Gaines, whom she had suckled, and may have considered that there was no good then to be derived by her in speaking of the will; or, what is equally possible, she may have made reference to it which was not understood or was forgotten by Mr. Brown. A number of witnesses attest her entire respectability and credibility, and taking Brown's testimony in the most favorable light, it does not necessarily contradict and cannot avail to materially weaken the testimony of a disinterested witness, clearly intelligent, and proved by numerous witnesses to be trustworthy.

As to the letter of Bellechasse to Mr. Cox, probate record, page 855, vol. 1, he is recorded as saying: "I was one of his executors, as well as Messrs. Relf, De la Croix and Pitot." Thus adding Relf to the executors whom he and Mrs. Smythe say were named in the last will. But in the next sentence, with reference to his avowal of having re-

ceived a conveyance of fifty-one lots in secret trust for Myra, now Mrs. Gaines, he uses the same names and in the same order. This all appears as a translation, the French original having mysteriously disappeared. Now, it is quite possible that either in writing out the translation of the letter, the copyist may have fallen into the error of using all the three names in both collocations, though in the first, that of Relf might not have stood in the original, or in the original letter, if, as Bellechasse states, he wrote through an amanuensis and by dictation; the name of Relf may have by mistake slipped in in one of the collocations, although the writer never designed it to be there, and never observed that it was there.

Now, as to Bellechasse, with the exception of this letter to Cox, there is nothing in the record to impugn or qualify what he says; his language and ideas throughout are those of an earnest, chivalrous man, who is entirely sincere. There is a further fact, that upon the death of Clark he avowed that the fifty-one lots of ground had been placed in his name in secret trust for Clark's daughter, now Mrs. Gaines. It seems to me that he appears not only as an unimpeached, but as a thoroughly upright witness, and I have never read testimony which has impressed me as uttering more frankly the truth.

I think, then, that the testimony of Mrs. Smythe and that of Bellechasse is unshaken, and they establish the will. But they are not alone. De la Croix himself was a witness in favor of the second will, though subsequently he sought to vary his testimony. On page 78 of the probate record, he says: "Clark, some months previous to his death, asked me to become tutor to Myra;" that a month or two after this conversation he, deponent, called to see Clark, who had his house on the Bayou road; he found him in his cabinet; he had just sealed up a packet, the superscription on which was as follows: "Pour être ouvert en cas de mort;" that Clark threw it down in presence of deponent and told him that it contained his last will and some other papers which would be of service.

It is to be observed, as the supreme court of Louisiana noticed, this superscription effectually proves that this envelope must have contained a will other than that of the will of 1811. The testimony of Boisfontaine, at page 79 of the probate record, states that Clark, in his last illness spoke to him about his last will and testament, and told deponent that he had left the greater part of his property to his child, Myra, and that he had made a disposition in his last will to that effect. He says Clark always told him (deponent) that Myra was his daughter; that he loved her, and would leave her all that he could as a father. It is to be observed that Bellechasse's testimony, at page 162 of the probate record, in reply to the 12th cross-interrogatory, states that Judge

Pitot, the judge of the court of probate, at New Orleans, examined the will after it was finished. Mrs. Marian Rose Davis, at page 167 of the probate record, in answer to the 19th interrogatory, says, "When we were about to depart from Louisiana in 1812, Mr. Clark said that she, Myra, would be his heir; that he intended to leave his estate to her. He spoke in terms of great affection and pecuniary ambition about her, and again said that he should leave her all his estate; his ambition was stimulated to make her very rich." Again, in answer to the 21st interrogatory, "He spoke of her as his heir, and in speaking of her education said, he wished her educated in a manner suitable to take in society the standing of the heir of his estate."

Samuel B. Davis, page 172, in answer to the twelfth interrogatory, says: "Mr. Clark always did manifest the warmest affection and deepest interest towards his daughter; he has repeatedly told me that he intended to leave her his property, and I never doubted that he was entirely sincere." To the eighteenth interrogatory, on the same page, he says: "I heard him (Clark) on all occasions express himself in favor of her (Mrs. Gaines) as his daughter and heir; it was an everyday conversation when we met." In answer to the twenty-first interrogatory, at page 173, he says: "It was impossible for any father to have manifested more solicitude and affection than he did. In my last interview with Mr. Clark his conversation turned almost exclusively on the subject of his child; it was then that I received the instructions relative to her education, about which he seemed to be very solicitous, and about the place he wished her to take in society when she arrived at the years of maturity."

Wiliam Miller, at page 179 of the probate record, says, in answer to the twelfth and fourteenth points: "That Clark frequently expressed much affection for the said child Myra, and stated that he intended to make ample provision for her as one of his heirs."

If human testimony can establish a fact, it is here proved by overwhelming evidence that it was the settled purpose of Clark to make Myra his heir by his last will; that for some reason, probably that stated by the supreme court in 24 How. [65 U. S.] 553 and 6 Wall. [73 U. S.] 642, he did not, during his life-time, wish publicly to acknowledge her as his child, or admit the marriage with her mother, but that to all his friends he admitted that she was to be his heir. Now, can any reason be suggested why Daniel Clark, when the shadows of death gathered around him, should have changed his purpose to do this late justice to a daughter to whom he was so devotedly attached, and from whom he had withheld the enjoyment of the rights to which, as his child, she was entitled? It seems to me not. It seems to me that

as his years advanced his attachment to his child and his purpose to provide for her by his last will, as was natural, continued to increase. Now, when we add to this the clear and undisputed testimony of Mrs. Smythe and Bellechasse as to the terms of this will, that it was a will made in Myra's interest, and precisely such a one as a father, with the settled purpose that the other witnesses testify he avowed to them with reference to her, would have made, that we have here conclusive testimony not only of his purpose to make this will, but that he did make it. And this testimony is drawn from precisely the sources where we would have supposed that it would be found to exist, viz., from the intimate friends of the testator.

I think if human testimony can establish the execution of this will, it is found in this record, and that an olographic will, such as is claimed by Mrs. Gaines, to have existed was made, written, signed and dated by her father, Daniel Clark. This brings me to the last question of fact, with reference to the will.

The will not being found after his death, is the presumption of law overcome by the evidence in this case? Is it proved that the will existed up to and after the death of Clark? It does not seem to me to be necessary to conclude that Relf destroyed it. Clark may have deposited it with some person who never produced it. What does the evidence show as to the continuance of its existence up to the time of his death? The mind of any one familiar with the evidence in this case, it being established by irrefragable testimony that he had made the will of 1813, would be reluctant to believe that a father who had by a last will given all his property to an only daughter, who from the reason probably that the acknowledgment of the marriage with her mother would have interfered with his personal ambition, had during his life time withheld such an acknowledgment from the public; had, in fact, lived a two-fold life, one part of which was necessarily inconsistent with the other, but who had centered upon this daughter all the affection which a father was capable of feeling, I say the mind of such a one would reluctantly receive the conviction that he had, without any change in his circumstances, and without any reason assigned or assignable, upon his death-bed, changed his plan and left his daughter penniless, excepting the provision which he had made for her through Bellechasse. I do not say that the presumption arising from these central facts in Clark's life would in law be sufficient to show that the will of 1813 survived him; but I do say that they prepare the mind to find in the record the testimony which will establish that fact. Such testimony is found in the statement of Boisfontaine. Boisfontaine, at pages 79 and 80, says that he was with Clark during the last two days of his life—he never left his bedside, and that during his last hours he spoke

of this will and of the gratification it gave him that by means of it he had provided for his daughter. What more natural than this? What more credible? And it is testified to by a witness who is uncontradicted, excepting by a circumstance which has been attempted to be drawn from the testimony of De la Croix. De la Croix was made the tutor of Myra in the will of 1813, as well as one of the executors. De la Croix, in his testimony in the case known as No. 122, at page 536, states in substance, that the day before Clark's death he called at his house and had an interview with him; that nothing was said about the will of 1813.

The argument has been pressed with great force by the solicitors for Fuentes et al., that if Clark then had the will he would have delivered it to De la Croix, and I am asked to infer from the silence of Clark in this interview on the subject of the will, that it had ceased to exist. The conclusive answer to that argument is that whatever that interview was, it had not, in De la Croix's mind, destroyed, or at all shaken his belief that Clark had left the will of 1813 in existence at the time of his death, for at page 11 of the probate record, he presented to the judge of probate a petition sworn to by himself, in which he stated that he had strong reasons to believe, and did verily believe, that there was a subsequent will to that of 1811, whose existence was well known by several persons, and asked that the notaries of New Orleans be subpoenaed to see if they could not produce the duplicate of this last will— that is, the will of 1813. It is clear from this affidavit made within a day or two, or a few days after the death of Clark, that De la Croix not only believed that the will of 1813 survived Clark, but that it was executed in duplicate, and the clear implication is that he believed that one of these duplicate copies had been destroyed after the death of Clark. It further appears from this affidavit of De la Croix, that he was expressing, not only his belief, but the belief of the friends of Clark.

Now, I think the conclusion of the supreme court of the United States, in the case of Gaines v. De la Croix, 6 Wall. [73 U. S.] 719, as to the effect which should be given to this statement of his, is unanswerable.

I think his subsequent testimony, given in 1848, after a controversy had arisen between him and Mrs. Gaines, goes for nothing as contrasted with his own affidavit made in 1813, and so far from the statements of De la Croix contradicting Boisfontaine, they are a powerful confirmation of his evidence upon this point, and go far to establish not only that he believed that the will of 1813 existed after the death of Clark, but that he believed it upon sufficient evidence. I think, therefore, that the presumption which under the law of Louisiana arises from the non-production of the will of 1813, and its disappearance, is most satisfactorily rebutted by the evidence in this case, and that it is proved

that the will known as the will of 1813 was in existence after the death of the testator.

I, therefore, find as a fact, that an olographic will of Daniel Clark, in which Mrs. Gaines was recognized as his legitimate child, and, with the exception of the legacy to his mother, and some other small legacies, was made his universal legatee, was written, signed and dated by him; that this will was clothed with the requisite and legal formalities of a last will and testament according to the laws of Louisiana.

Let the decree, therefore, be, that the prayer of the petitioners in the case of Fuentes et al., etc., against Mrs. Myra Clark Gaines, be rejected.

I now come to a decision upon what may be termed the direct actions, viz., the suits in which Mrs. Gaines seeks to charge these numerous defendants as trustees, and to recover from them certain real estate, alleging that she was the legitimate child of Daniel Clark, and under his last will and testament his universal legatee. I have found as a fact, upon a fresh consideration of all the evidence, that her allegations as to the will and her heirship are established. This finding carries with it all the consequences which are necessary to establish her title to the property, and leaves nothing remaining to be considered but the plea of prescription.

The plea of the respondents is to the effect that they derived their title and have possessed the property in good faith, and that this possession has continued for more than a period of ten years. They have thus sought to dissever their title from its origin, and have sought to stand before the court simply as possessors with what they say seemed a good title, and that therefore they are possessors in good faith. It is claimed by the solicitors of the complainant, and by his analysis of the chains of title under which the several defendants hold, it is shown that the title of each and every one of them comes back, or traces itself back to the estate of Daniel Clark through Relf and Chew, as the executors of the first will, and as the attorneys in fact of Mary Clark, legatee, under the first will. Indeed, in the supplemental petition of Fuentes et al., which has been adopted by all these defendants under the agreement on file, it is alleged at page 48 of the Fuentes Case, 160 and 161 of the marginal paging, "that the said R. Relf and B. Chew were the testamentary executors of the said D. Clark under the will of 1811, and were also the agents and attorneys in fact of Mary Clark, mother and sole testamentary and legal heir of the said D. Clark, and as such were the parties through whom these petitioners derived title to the property now claimed by the said defendant."

It is not necessary for me to comment upon the effect of this judicial admission further than to say that it is a distinct avowal that they claim under Relf and Chew as the executors and attorneys in fact under the first will, and this leaves them in the situation of having denied what they were legally bound to know. See Gaines v. Hennen, 24 How. [65 U. S.] 615, 616; Gaines v. Mausseaux [Case No. 5,176], and what they admit in the Fuentes Case they did know.

These cases are undistinguishable in principle from that of the case of Gaines v. Hennen, supra. It is both proved and avowed in this case, which was admitted there, viz., that the title was derived from Relf and Chew by the sales under the first will. Such a title the supreme court of the United States, in the case of Gaines v. Hennen, decided was an illegal and vicious title, and that the vice of the title took from the vendees all pretense of purchasers or possessors in good faith. In that case the supreme court took pains to put into their decree, after reciting the conveyance from Relf and Chew through these intermediate grantees and the conveyance to Hennen, that "the defendant Hennen at the time when he purchased the property so described and claimed by him as aforesaid, was bound to take notice of the circumstances which rendered the acts and doings of the said Relf and Chew in the premises illegal, null and void; that the said Hennen ought to be deemed and held, and is hereby deemed and held, to have purchased the property in question with full notice," etc. This view is adhered to in Gaines v. New Orleans, 6 Wall. [73 U. S.] 716, 717, where the court declare that the question is no longer an open one.

The evidence here on both sides as to the minority and the interruptions of prescription is precisely what it was in the case last referred to. Indeed it is all taken from the record in that case, and I think the supreme court of the United States have settled in the most solemn and authoritative manner that this plea cannot be urged by these defendants. Let there be judgment, therefore, for the complainant, Myra Clark Gaines.