Lucas, Wife et als. v. Ellen C. Brooks et als.

No. 1938.—R. A. Lucas, Wife et als. *v.* Ellen C. Brooks et als.

23 117
47 1468

If the loss or destruction of an olographic will or a sealed letter, which it is claimed is a part of the will, be shown, the legatee claiming under the will or the sealed letter, may establish either the contents of the will or the sealed letter, so lost or destroyed, by secondary evidence. And if it be alleged and shown by the legatee, who claims under the sealed letter, that the universal legatee under the will, into whose possession the sealed letter came, fraudulently concealed or destroyed it, then, and in that case, the court will apply, in favor of the party claiming under the sealed letter as a part of the will thus lost or destroyed and against the spoliator, the maxim, *omnia præsumuntur contra spoliatorem.* But this rule will not be applied unless the evidence makes it certain that the universal legatee, into whose possession the sealed letter came, concealed or destroyed it for the purpose of defeating its bequests.

Where a sealed letter, which accompanied the will, has been lost or destroyed, which sealed letter it is claimed constituted a part of the will, is sought to be established by secondary evidence as forming a part of the will, which has been admitted to probate, all the evidence necessary to establish the validity of an olographic will must be produced. The signature of the sealed letter, claimed to be a part of the will, must be proved in the same manner and by the same kind of testimony that are required to prove the signature to the will itself. If the evidence and presumptions in the record are sufficient to establish that the sealed letter was written and dated by the testator, this fact, coupled with the presumption that men generally sign all letters written by them, is not sufficient to justify the court in concluding that the sealed letter, claimed to be a part of the will, was signed by the testator.

APPEAL from the Second District Court, parish of Orleans. *Thomas, J. Campbell, Spofford & Campbell,* for plaintiffs and appellants. *Conrad & Son* and *C. Roselius* and *Alfred Philips* and *Randall Hunt,* for defendants and appellees.

Howell, J. James H. Shepherd died in New Orleans on the twenty-seventh of July, 1837, leaving no descendants, but a mother, four brothers, a sister and the children of a predeceased sister, residing out of this State. Among his papers was found an envelope bearing a superscription in his handwriting, as follows : "Inclosing J. H. S. will and a communication to R. D. Shepherd, in case of his death, Abraham Shepherd." Upon being opened by the probate judge on the twenty-ninth July, 1837, two documents were found, one indorsed :

"J. H. Shepherd
Last olographical will and testament.
New Orleans, December 22, 1832.
Wafer [J. H. S.] seal ;"

the other a sealed letter addressed to "Rezin D. Shepherd, or, in case of his death, Abraham Shepherd;" both indorsements in the handwriting of the deceased. The will was duly probated, Judah Touro and Jonathan Montgomery were appointed dative testamentary executors and they entered upon the administration of the succession, which was inventoried at $616,694 69, and C. M. Conrad, Esq., was appointed attorney for absent heirs. The will is in the following words :

"I, James Harvey Shepherd, of the city of New Orleans, merchant, considering the uncertainty of this life, do make this, my last will and testament, as follows, that is to say:

*First*—I give and bequeath unto my brother, Rezin Davis Shepherd, all my estate, real and personal, and he is hereby authorized to take possession of the same without the intervention of any court of justice; should he, however, not survive me a sufficient time to take full possession of my estate, I then leave the same to my brother, Abraham Shepherd, who is hereby authorized to take possession in the same manner as my brother Rezin Davis, should he survive me.

*Second*—I now revoke all former wills and testaments made by me, but this, my last, which I confirm.

New Orleans, December 22, 1832.

J. H. SHEPHERD."

In December, 1837, R. D. Shepherd, who resided in Baltimore, Maryland, was recognized as the sole heir and legatee under this will, and, after a formal renunciation by his mother, dated in September, 1837, was subsequently, by order of court, regularly put in possession of the whole estate and so continued as sole owner, using and disposing of it until his death, in November, 1865, when he bequeathed all his property, without distinction, to his daughter and her two sons, the defendants herein. The mortuary record of the succession of J. H. Shepherd does not show what became of the sealed letter addressed to R. D. Shepherd, but it appears in this record that it was handed to Mr. Touro in court on the day of the probate, to be forwarded according to its address, and that it came soon after into the hands of Rezin in Baltimore.

This suit was instituted in February, 1867, to procure from his legatees the production thereof, to ascertain its contents, import and intention, and to give authenticity and effect to it as a part of the will of J. H. Shepherd.

The plaintiffs, who are some of the children and descendants of Abraham and Henry Shepherd, brothers of the testator, allege that the said "sealed letter" was testamentary in its nature and import; was written, dated and signed by the said James H. Shepherd; that it has been concealed, suppressed and destroyed by Rezin D. Shepherd, whose duty it was, as well as of the said executors, to present it to the court for probate; that the two papers constitute the will of the deceased, the dispositions of which can be carried into effect, although upon the face of them there may be a purpose to evade the laws of Louisiana and there may be clauses in them which create substitutions and *fidei commissa;* that some of the provisions of the sealed letter, which radically changes the dispositions of the probated paper, have been carried into effect by the said Rezin, who admitted that it was obligatory in form and binding upon him in good conscience, and they propound the following as in substance the contents thereof, taken from a letter written by Abraham Shepherd to one Edmund J. Lee, to wit:

"Extract from a letter to me from R. D. Shepherd, dated ninth October, 1838: Mr. Touro has the original letter in his possession, a copy of which you have seen, (I mean the sealed letter left by James with his will,) and this directs that mother shall renounce all claim to the estate and that Ann shall have only $5000, Moses nothing, Eliza $10,000, the residue to be divided amongst his nephews and nieces, double as much to the boys as girls; but all these things you know, as you have seen the letter."

"The sealed letter," adds Mr. Abraham Shepherd, "above alluded to also excludes expressly my brother Rezin's daughter from any part of this estate, stating as his reasons that Rezin would be enabled to provide amply for her himself. It contains also a legacy, I think, of $2000 to George Lee, his clerk, and one of his gold watch to Mr. Touro. My brother Rezin is to have full control of the estate, after distribution of these legacies, during his life, with the power of excluding any of the nephews and nieces referred to, should they, by vice or crime, become degraded or unworthy. Such part of the estate as may be necessary for his use and comfort he is authorized to appropriate thereto, and is requested to make a will immediately that shall dispose of his estate at his (that is Rezin's) death agreeably to the above directions.

"The recorded will briefly devises the whole estate to R. D. Shepherd, and in case of his not acting, precisely in the same manner to myself, thus clearly intending that either of us should hold it subject to the instructions of his (James's) sealed letter, that is, as trustees for his nephews and nieces referred to.

(Signed)                          AB. SHEPHERD."

In the original letter the words, "Henry's and my children," follow the words, "referred to," but are omitted in the petition.

The plaintiffs pray for citation of defendants and all parties interested, and that the authenticity and legal effect of said testamentary paper be established, an account of said succession be ordered, the rights of the parties as heirs at law or legatees under said will, including the sealed letter, be fixed and a partition made according to the laws of Louisiana applicable to this succession. They do not pray expressly or explicitly for the probate of the said document as the will of the deceased and an order for its execution, but in an annexed petition they declare that they have presented it for probate, and it may be the necessary implication of their allegations and object of their suit, otherwise there is no cause of action.

The defendants deny any knowledge of the "sealed letter," set up title under the will of Rezin D. Shepherd, the renunciation of his mother, the plea of *res judicata* and the prescriptions of five, ten and twenty years.

The first question for solution is: Is the " sealed letter " the will or part of the will, in olographic form, of James H. Shepherd?

A testament is the act of last will, clothed with certain solemnities, by which the testator disposes of his property, either universally or by universal title or by particular title.   C. C. 1564.

The name given to the act of last will is of no importance.   If it be clothed with the forms required for the validity of a testament and the clauses it contains or the manner in which it is made *clearly* establish that it is a disposition of last will, it is a valid testament.   C. C. 1563.

The formalities to which testaments are subjected by the provisions of the code, must be observed, otherwise the testaments are null and void.   C. C. 1588.

The olographic testament, to be valid, must be entirely written, dated and signed by the hand of the testator.   C. C. 1581.   It must be acknowledged and proved by the declaration of two credible persons, who must attest that they recognize the testament as being entirely written, dated and signed in the testator's handwriting, as having often seen him write and sign during his lifetime.   C. C. 1648.   And these declarations shall be taken in writing, signed by the witnesses and recorded.   C. P. 939 *et seq.*

This proof has not been adduced in this case and no witness testifies to having ever seen the instrument under consideration.   It is true, however, that a communication in writing addressed to, and received by, R. D. Shepherd, was found in the envelop with the will which was probated, and the plaintiffs have undertaken to prove it as a will lost or destroyed, upon the principle, which seems to be settled, that in case of the loss or destruction of an olographic will, the legatee may establish it by secondary evidence.   See 11 An. 124 and authorities there cited

In the effort to do this they allege and claim to have proved that the sealed letter was testamentary in its purport and was fraudulently concealed and destroyed by R. D. Shepherd, under the maxim *omnia præsumuntur contra spoliatorem* and the direct evidence adduced by them, and that under the operation of this maxim, together with the fact that men generally sign all letters written by them, we must presume that this letter, admitting it to be written and dated by the testator, was also signed by him.   The fact that men generally sign their letters, can have little effect in proving the signature to an olographic will. It is just as necessary to prove the signature as the date and handwriting, and the failure to prove either one by some competent evidence will render the testament invalid.   Custom is not admitted as proof of either.   And the fact that private letters are sometimes not signed, will leave uncertainty at least.   But conceding that the solemn formalities of an olographic will may be established in Louis-

iana by presumption, do the facts developed in the record warrant the application of the maxim, thus invoked against the defendants, and so supply the proof? We think not. It is clearly shown that in August or September, 1837, soon after the death of James and before Rezin came to New Orleans to take possession of the succession, Abraham, the father of some of these plaintiffs and an attorney at law, was shown a copy of this sealed letter and knew then as much of its character and contents as afterwards or as plaintiffs now do ; and that in October, 1838, he wrote the letter, which is propounded as the substance of the will which they ask to be probated and in which is the extract from a letter of Rezin, informing him, and others through him, that the original letter, the "sealed letter," was then in the possession of Mr. Touro. In several other letters to Abraham during that and the succeeding year, Rezin alludes freely to the contents of this letter and his own views and purposes in regard to it. It was also equally known to the mother, when in 1837 she renounced, and to Moses, another brother. In August, 1839, Rezin wrote to his sister Ann, describing it fully and telling her that he had shown it to Abraham, to Mr. Touro and Mr. Montgomery, and had deposited it with his will. In the same month he wrote on this subject to E. J. Lee, also a lawyer and the surviving husband of his sister, Eliza, and to whom Abraham had, in October, 1838, written the letter copied in the petition. In April, 1844, he again wrote to Lee, giving the purport of said sealed letter; and in March, 1849, he wrote to Lee and his brother, Henry, the father of the other plaintiffs, on the same subject, giving his own construction of the letter and its scope and intent. Robert Lucas, connected with one of the plaintiffs, testifies that, in 1859, he alluded to the contents of said letter in a conversation with Rezin, who replied that he then had it. The depositions of Lee, William Lucas and others show that the existence, nature and contents of said letter were known to, and frequently discussed by, the several branches of the Shepherd family soon after the death of James and since.

Under these circumstances there was no such concealment, suppression or deception as to authorize the invocation of this maxim against Rezin himself. A very strong case must be presented to warrant the charge, under any circumstances, that a private sealed letter has been concealed or suppressed, to the prejudice of third parties, by the person to whom it is written. The law and society attach deserved inviolability to private correspondence, and courts of justice are careful rather to guard than invade that inviolability. The action of the probate judge in turning over this letter to those seeking the probate of the will, to be delivered as addressed, was in accordance with, and justified by, this principle.

16

There is no proof in the record that Rezin destroyed this letter, and the defendants never saw it. The destruction of books and papers, which occurred in 1855, was of mercantile effects, and prior to the date at which plaintiffs prove it to have been in existence. No one ever made a demand on Rezin for the production or view of the letter, or took any step to assert any right under it during his lifetime. The plaintiffs or their parents have known for thirty years what they now know, and what they ask the court to accept as a will. If it was believed that this "sealed letter" contained testamentary dispositions in favor of those now claiming, its production could have been secured during the lifetime of Rezin, or at least the proper effort should have been made

But can this presumption, if applicable as against Rezin, be invoked against these defendants, who, it is admitted, know nothing of the existence or nature of the letter? The charge made is a crime, and it is carrying the doctrine too far to apply it to parties totally ignorant of, and not responsible for, the personal crimes of another. It is truly said the defendants will benefit by the crime of their ancestor, if committed, and yet it is not from that solely, but also from the neglect of plaintiffs or their ancestors to urge their demand when they might properly have invoked this rule of evidence. They should not profit by their own fault, nor be exempt from the consequences of their ancestors' fault, any more than the defendants from that of their ancestors. To apply this rule in this case would make titles to property derived from testaments most precarious.

The law has provided for the transmission of property at the death of the owner, but has given to the owner the right to modify and change this order under certain fixed conditions, a compliance with which is essential. When the prescribed conditions and forms are shown plainly to have been observed, and rights of property are vested and enjoyed for a series of years under them, something more than suspicion, inference, surmise or presumption, drawn from a fragmentary family correspondence, covering many years, is required to overturn what has been done apparently in strict conformity with law, and has regularly received the sanction of the appropriate tribunal of justice. We do not pretend to imply that a will, made in legal form and executed under an order of court, may not be set aside. But we do say that when, as in this case, the attempt is made after a lapse of nearly a third of a century, and the immediate actors have passed away, the parties who make it and do not show surprise, recent discoveries of their rights, or some good cause for such delay, must be held to the strictest proofs.

The plaintiffs have not cited any authority in our State, where the formalities of an olographic will have been established under the

maxim as invoked here, and we have been unable to find any. Some French and English works are quoted with much confidence as supporting such a doctrine, but it is well to bear in mind that the law, in Louisiana, in relation to the form and proof of olographic wills, differs in some important respects from the law on the same subject in the countries referred to. An examination, however, of those cited shows them to be actions against the immediate legatees or devisees, and in cases where they were called on by due process, and had been shown to have committed suppression, mutilation or destruction. The cases most analagous are reported in Dalloz' *Jurisprudence Generale,* and in them the parties held liable had been proceeded against *correctively* [criminally], and found guilty of having mutilated, concealed or destroyed *second* wills, by which the first, under which they held, were revoked or supplemented, and the courts decided that the principle, on which the maxim invoked herein is founded, should apply. Without expressing concurrence or dissent as to the reasoning and decisions in those cases, we need only remark that the law and facts thereof do not apply to this. As the rule does not apply, we can not say the defendants are not permitted to object, that it is not shown that the instrument was in due form, and to require direct proof thereof, which proof has not been furnished.

But, admitting it to be entirely written, dated and signed by James H. Shepherd, it is not shown to have contained testamentary dispositions of the testator's property, in the sense of the law defining testaments, and should not, consequently, be admitted to probate and execution as his will, and, as a matter of course, it can have no effect whatever for any purpose unless probated and ordered to be executed. C. C. 1637; 6 An. 105.

All that Rezin has written and said about it must be taken together as evidence, and from it we conclude that the "sealed letter" was not testamentary, or a part of the will of James, but simply a confidential letter to his legatee, containing suggestions and requests, a compliance with which rested in the conscience of the legatee. It is notable that in each of his letters bearing directly on this point, introduced in evidence by the plaintiffs, Rezin emphatically stated that the giving or disposal contemplated was left to his own discretion; and where he uses the words "legacies," "bequests," etc., the context and his conduct show that they were gifts which he himself was to make as owner by universal title under the will, and not legacies left by James. He also states that, in a letter of subsequent date to the one in question, James made some changes in the suggestions contained in the former. All that any of the witnesses have said is derived originally from Rezin, whose statements must control. A testament disposes of the property of the testator, and not of the legatee.

It is evident, also, that James did not consider this document as his will, or any part of it. He very clearly indicated, by the indorsements on the envelops and other respective papers, which was his will and which was not. He distinctly named and marked one a "will," and the other "a *communication* to R. D. Shepherd"—not a codicil to his will, not directions as to carrying out his own dispositions of his estate, but a communication, a letter, sealed and addressed to "R. D. Shepherd, or, in case of his death, Abraham Shepherd." In the will, no reference is made to the letter, and the record does not show it to be anything more than what he intended it—a private letter, lacking the legal requisites of a will, and conferring on third parties no rights that can be enforced by action at law.

It is clear, also, from their conduct, that the family did not consider it a will in their favor, but, at most, a direction or request to Rezin to make *his* will in their favor, and they do not agree as to the manner in which, or the persons in whose favor, it was to be made. Henry Shepherd, the brother, says that after the letters to himself and Lee were received, his mother and brother Abraham always acted and spoke in perfect harmony with the hypothesis that the testamentary disposition made by James H. Shepherd of his estate to R. D. Shepherd was final and conclusive, and no question was ever made, to his knowledge, as to the correctness of the information imparted by Rezin in said letters. One of the brothers, the brother-in-law, and one or two of the friends of the family who have testified, were lawyers, and if the sealed letter was thought to have conferred any legal rights, they certainly could and would have been asserted.

It must be borne in mind that no one is claiming a special legacy or damages for withholding what was devised to one or more. To such a claim the plea of prescription would be successfully opposed. The suit is to establish a certain document of a concurrent date, as a part of the will of James H. Shepherd, which, as described, would, if effectual, make a totally different disposal from, and really revoke, the part acknowledged, probated and executed as a will. This demand, in our opinion, is not sustained by legal proofs. To probate it would be the making, by the court, of a new and different will for the testator from the mere declarations of the parties for whose benefit the will is to be made, not as to what they know, but as to their recollection of what Rezin had told or written to them.

Judgment affirmed.

———

WYLY, J., *concurring.* Large amounts appear to be involved, and great learning and ability have been displayed by the counsel engaged in this litigation; many difficult questions of law have been discussed

in the written and oral arguments, especially the doctrine of substitutions, vulgar and *fidei* commissary; but I do not regard these cases as difficult.

A man named Shepherd died in this city in 1837, leaving his olographic will and a sealed letter addressed to his universal legatee; they were both contained in the same package or envelop; the olographic will was duly proved, registered, ordered to be executed, and the universal legatee went regularly into possession of the est te, the sealed letter was delivered to the universal legatee, to whom it was directed, and very soon thereafter the heirs at law of the testator were advised of the contents of the sealed letter by the universal legatee.

The complaints of the heirs at law now are, that this sealed letter, of the contents of which they were advised at least a quarter of a century ago, was a testamentary paper, and was part of the will of the testator, and should have been probated with the olographic will in 1837.

The universal legatee is dead, and his heirs, in answer to the call for the sealed letter, say it was never in their possession, and they have no knowledge concerning it.

This sealed letter has never been probated, and the record does not contain sufficient proof to admit it to probate; it is not shown that this letter, left with his will, was designed by the testator to form a part thereof; it is not shown that the letter was wholly dated, written and signed by the testator; that it instituted an heir, or was intended as a testament. But it is contended that the sealed letter was suppressed by the universal legatee after he received it; that he was a spoliator, and all the presumptions are against him and his heirs. I fully recognize the force of the maxim, but think its application not justified by the facts disclosed in the record of these cases. A letter of such importance, of the contents of which the heirs at law have been advised by the universal legatee for a quarter of a century, and held by him openly for so long a period to their knowledge, without ever a call being made by them for it, or even an intimation that it was a testamentary paper, can not fairly be said to be a suppressed testament at this late day, because the heirs of the universal legatee are not able to produce it. The fact that he so often communicated its contents in his numerous letters to the heirs at law, and held it openly for so many years without any demand for it on their part, or any charge that it was a testamentary paper, convinces me that there was no suppression of a testament in contemplation of law or otherwise.

It is useless to discuss the contents of the sealed letter, whether it was a testamentary paper, involving a *fidei* commissary; substitution or not, because it has not been proved and ordered to be executed. Article 1637, C. C., provides that a testament is without effect until it

is proved and the execution of it is ordered.   This principle was recognized in the case of Stewart's Curator *v.* Row, 10 La. 530; also in Marcus *v.* Barcas, 5 An. 265, in which it was held that until a will has been proved, "it can produce no legal effect, and is not admissible in evidence."   In the case of the Heirs of Landry *v.* Heirs of Duarin, 5 An. 612, it was held that: "A testament is without effect until it has been duly proved and the execution ordered by competent authority."   The same doctrine is affirmed in Aubert *v.* Aubert et al., 6 An. 104. Whether the sealed letter was a testamentary paper or not, it can have no effect, because it has not been proved, and the records do not contain sufficient evidence to entitle it to probate.   The maxim, *omnia præsumuntur contra spoliatorem,* has no application whatever to the cases before us, as disclosed by the records, there being no suppression of a testament, or a testamentary paper, in contemplation of law.

There being no proof to authorize the probate of any other will, or evidence of the suppression of a testamentary paper as charged, I think the olographic will, probated in 1837, should remain undisturbed, and the title to property, acquired thereunder, more than a quarter of a century ago, should not now be questioned.

I concur in the opinion of the court in these cases.

------

TALIAFERRO, J., *dissenting.*   I dissent from the opinion of the majority of the court for the reason that I believe the "sealed letter" constituted a part of the will of James H. Shepherd and that it was fraudulently concealed and destroyed.   I am not satisfied from anything in the record of the case that the letter was merely a memorandum or statement of the wishes of the testator, the compliance with which was contingent upon the will of Rezin D. Shepherd.   I conclude from the entire evidence that, in relation to the plaintiff in these cases, the conduct of this man throughout his entire management of the succession of his brother, was disingenuous, evasive, tortuous.   It is not clear to my mind he ever disclosed fully and truthfully the purposes expressed by the testator in that letter.   He has, however, disclosed enough to satisfy me that that instrument should be taken and construed as part of the will of the testator.   The disclosure which he has made shows that the instrument conferred rights upon the plaintiffs.   He spoke of it as containing "legacies" and "bequests" made by his brother.   Referring to it he said: "This directs that mother shall renounce all claim to the estate, and that Ann shall have only $5000, Moses nothing, Eliza Lee $10,000; the residue to be divided amongst his nephews and nieces, double as much to the boys as the girls."   He subsequently said in regard to Mrs. Hammond: "I shall see that all her rights shall be taken care of according to the

wording of the sealed letter.   He thought his brother had rather "cut her off" by leaving her only $5000.   "The residue to be divided," etc. The terms and phraseology used clearly import that testamentary dispositions were made by this instrument.   He kept the sealed letter strictly to himself and talked about what it contained.   When he found that suspicion was aroused in regard to his dealings with those who were interested in the provisions contained in the act, he announced that it should be placed with his own will to stand as a shield to protect him against obloquy and reproach.   This pledge he did not redeem.   His will was preserved amid the wreck of preceding years, but not the sealed letter.   Under this state of facts the terms and expressions used by him in speaking of its contents, when they import rights and benefits conferred upon others, are to be taken in their fullest and broadest sense; and with rigid scrutiny and tardy admission when they indicate advantages to himself.   Presumptions are all against him and in favor of the parties claiming rights under the act which was always in possession of, and withheld by, himself.

It is said in behalf of the defendants that the plaintiffs have slept upon their rights; that they should long since have demanded the production of the sealed letter, if they believed it to be a will and to contain important provisions in their favor.   By the version given of the sealed letter by R. D. Shepherd, the plaintiffs were to receive nothing, or at least were to wait until his demise for the greater part of what they were to receive; that the request of James H. Shepherd was, that the plaintiffs were to be provided for by Rezin D. Shepherd's will.   They waited for this will and got nothing by it.   If the plaintiffs have slept upon their rights, their lethargy, it is clear to me, was produced by *placebos* administered by Rezin D. Shepherd. He exercised a controlling influence over them, at times holding out encouraging hopes, and at other times assuming a tone of intimidation and a manner of expression calculated to dampen their expectations.   He had their confidence, and they trusted to his faith and fair dealing.

The efforts made on the part of the defense to show that the estate of James H. Shepherd was insolvent, I do not regard as successful. There was, doubtless, a large indebtedness, but looking to the circumstances attending it and the means and appliances of the estate, that indebtedness was not so formidable as pretended.   It is a significant fact that no record has been shown of the administration by R. D. Shepherd of that large estate ; no books or papers presented to show its exact condition and liquidation.   It is a matter of history that at the time of the death of James H. Shepherd, 1837, a ruinous revulsion in the financial affairs of this country occurred, the result of an inflated paper currency, which, through an unwise policy, was inaugu-

rated upon the expiration of the last charter of the National Bank, in 1832. Yet, although in the commercial circles many failures occurred, and serious troubles affected the agricultural and manufacturing interests, so great were the recuperative energies of the nation that these difficulties were of short duration. When, by the kind feelings of his wealthy and philanthropic friend, Mr. Touro, money was promptly advanced in large amounts to discharge the pressing debts of James H. Shepherd, and enable the administrator to pass the crisis in safety, only ordinary business capacities were required to retrieve the estate from its embarrassments. These facts were known to Mr. Touro or else he would hardly have been so liberal. He knew he was lending money on good security, and doubtless he received every dollar of it back. That Rezin D. Shepherd did use energy and skill in marshaling the resources of the estate and directing them with judgment, and that he did advance freely money of his own in aid of his brother's estate, and that the estate owed him, there can be no doubt; but I am slow to believe that all his labors and sacrifices in that direction entitled him to gulp this immense property for his pains. He said he was constituted universal legatee of his brother's estate by way of security for a heavy debt his brother owed him. Without adverting to the novelty of this kind of security, it may be remarked that, if such were the case, it must be presumed in the absence of any account or exhibit of his management of the estate, that this heavy debt, as well as all other debts of the estate, was finally paid out of the resources, revenues and means of the estate. After a pretty careful examination of this part of the controversy, I am of the opinion that the counsel for the plaintiffs have rendered ineffectual the efforts on the other side of the question to show an insolvency of the estate, and, as alleged by R. D. Shepherd, to establish the great losses sustained from the failure of its debtors, and that much of the property of the estate would never be worth its appraised value. The large sugar estate called "Golden Grove," yielded a net annual revenue of from $20,000 to $25,000; it was cultivated by R. D. Shepherd four years, and was afterward sold for $250,000. The executors collected $201,000, and turned over to R. D. Shepherd property appraised, at a time of extreme though temporary depression of value, at $537,124. At the time R. D. Shepherd received the estate the debts against it amounted to $324,221

That a will may be written upon as many pieces of paper as a testator may choose, I think will not be denied. That the sealed letter was no will or part of a will because it was not probated, can not be maintained in face of the damaging fact that R. D. Shepherd, or his heirs having it in their own possession, have put it forever out of the power of the plaintiffs to present it for probate. The existence

of the instrument is proved; its destruction or loss by the act of R. D. Shepherd or his heirs is clearly established; its detention by R. D. Shepherd is a badge of fraud; the foundation is established for proving its contents; the character of its contents is sufficiently shown to constitute it a part of the will of James H. Shepherd, and it should so be taken in connection with the act with which it was found in the same envelop. As to whether the will be null on account of its containing a substitution or *fidei commissum*, I think would be an ulterior question, and I decline to consider it. I think judgment should be rendered in favor of plaintiffs.

Rehearing refused.