107 So.2d 437

Herbert McGREGOR et al.

v.

Lillie Wise McGREGOR.

No. 43526.

Dec. 15, 1958.

W. J. Rutledge, Jr., Bradford & McDaniel, Durango, Colo., Kay & Kay, De Ridder, Jones, Kimball, Harper, Tete & Wetherill, Lake Charles, for plaintiffs-appellants.

Moss & Graham, Lake Charles, for defendant-appellee.

McCALEB, Justice.

Colin A. McGregor died suddenly of a heart attack in Lake Charles, Louisiana, on November 24, 1949. He was survived by his widow, Lillie Wise McGregor, whom he had married in 1923. No children were born of the union, which the evidence shows to have been a happy one during the 26 years of its existence. Decedent's nearest blood relatives at the time of his death were his brother, Herbert McGregor, and his sister, Augusta McGregor Davidson, of Durango, Colorado, the plaintiffs in this case.

On December 14, 1949, the widow opened the succession in the then Eleventh Judicial District Court for the Parish of Vernon and presented for probate a will executed by her husband in Arkansas on August 16, 1929. By the terms of this will, she was instituted as universal legatee and bequeathed his entire estate, which consisted of an undivided one-half interest in the $250,000 community of acquets and gains formerly existing between them. On January 7, 1950, Mrs. McGregor secured a judgment recognizing her as surviving spouse in community and as her husband's sole legatee and she was put in possession of all property belonging to the community estate.

On December 18, 1953, Herbert McGregor and Mrs. Augusta McGregor Davidson filed the present suit against Mrs. Lillie Wise McGregor in the Thirteenth Judicial District Court for the Parish of Vernon, seeking an annulment of the prior probate proceedings in their brother's succession on the ground that decedent had executed a subsequent will in olographic form during November, 1943 which they allege had been either lost, destroyed or otherwise sup-

pressed by Mrs. McGregor. They further claimed that, in this lost or destroyed will, decedent bequeathed to his brother the sum of $50,000 and cancelled and discharged certain promissory notes amounting to $6,-000, which he owed the testator; that decedent's sister was bequeathed $25,000 and that the balance of the estate, after payment of debts, was to go to decedent's widow. It was prayed that the alleged destroyed or suppressed will be probated and that plaintiffs have judgment against Mrs. McGregor for the amount of their respective legacies, with interest and costs.

Following the submission of certain peremptory exceptions filed by decedent, plaintiffs were ordered, under penalty of dismissal, to supplement their pleadings by alleging, if they were able, the date in November 1943 on which the purported lost or destroyed olographic will of the deceased was executed. And, in due course, an amended petition was presented in which plaintiffs declared under oath, on information and belief, that the will was dated November 30, 1943.

Defendant interposed another exception of no cause of action to the petition and, upon the overruling of this pleading, filed her answer in which she denied all material allegations of fact contained in the original and amended petitions respecting the existence of the lost or destroyed will alleged by plaintiffs, affirmatively pleading that her husband's will of August 16, 1929, was the last and only will found after his death.

On the issues thus formed by the pleadings a trial was had at which voluminous evidence, both oral and documentary, was introduced. After a careful consideration of the case the district judge, in a well-reasoned opinion, held that plaintiffs had not established the verity of their claim and dismissed their suit. Hence this appeal.

■ In a lengthy brief presented to this Court on the facts and law of the case, plaintiffs' diligent counsel have attempted to demonstrate that the finding of the district judge is contrary to the preponderance of evidence and that the conclusions he draws from the conflicting testimony are not justified. But, after a careful consideration of the record, we are convinced that the judge did not err in his factual and legal findings. Indeed, we think his painstaking analysis of the verbal and written evidence submitted in the case is sound, so much so, that we shall adopt his treatment of the facts as our decision in the case.[1]

1. Generally (and this case is no exception), matters involving the probate of a lost or destroyed will present serious questions of law as well as fact and particularly so when fraud is charged. But in order to reach the legal issues posed for consideration, the existence of the asserted will must first be convincingly established. Since the trial judge, with whom we agree, found that plaintiffs had not carried their factual burden, there is, of course, no need for consideration

"In the spring of 1943, Mr. McGregor entered the Armed Services in World War II, as a Commander in the Navy, and on April 26, 1943, he was assigned as a Commander, to active duty with the Seabees. * * *[2] As many other Service men and their wives did, Mr. and Mrs. McGregor decided they should prepare reciprocal wills, whereupon, they, or one of them, contacted Mr. A. B. Cavanaugh, an Attorney of Lake Charles, Louisiana (who, in the testimony, is sometimes referred to as 'Speedy'), for the purpose of securing his legal advice as to the forms of such wills. On May 6, 1943, Mr. McGregor wrote Mr. Cavanaugh, requesting that he prepare a form of will for Mr. McGregor to name his wife as sole legatee, with the additional provision that, in the event of her prior death, his mother, brother and sister were to take the estate in equal proportions. In the same letter the attorney was requested to prepare a similar form of will for Mrs. McGregor, in which Mr. McGregor was to be the sole beneficiary and in the event of his prior death, naming his mother, brother and sister and brothers and sisters of Mrs. McGregor as equal beneficiaries. As shown by the mentioned letter, there had been a previous conference with the attorney concerning the preparation of the forms of wills. Mr. McGregor again wrote Mr. Cavanaugh on July 27th, 1943 and on June 30th, 1943, Mr.

Cavanaugh replied sending to Mr. McGregor the forms of wills he had prepared and which he had previously, June 19th, 1943, sent to Leesville, Louisiana, and to Durango, Colorado. According to Mr. Cavanaugh's testimony, exhibits 'P–10', and 'P–11', are copies of the forms prepared by him. A copy of Mr. Cavanaugh's letter of June 19, 1943, in which he first transmitted the forms of the wills to Leesville and to Durango, appears as Exhibit 'P–12'.

"Indicating the care exercised by Mr. McGregor, his desire to complete the execution of the will and the consideration he gave to its confection, are defendant's exhibits, 'D–5', 'd–6', 'D–7', 'D–8', and 'D–9'. 'D–5' is a letter from him to his wife, dated June 27, 1943, while he was at Camp Perry, Virginia, in which he mentioned the fact that Mr. Cavanaugh had not sent the forms of the will. 'D–6' is another letter from Mr. McGregor to Mrs. McGregor, dated July 3, 1943, from Camp Perry, in which he said he had received the forms of the will prepared by Mr. Cavanaugh, and saying that he would copy the form and mail it to Mrs. McGregor. 'D–7' is a letter written by Mr. McGregor to his wife, dated July 5, 1943, in which he acknowledges receipt of a copy of the will form sent him by Mrs. McGregor making certain changes in names and addresses in the will, see Exhibit 'D–8'. The letter dated July 28, 1943, from Mr. Mc-

of the law applicable to lost or destroyed wills which he has also discussed at length in his written opinion.

2. Reference by the judge to pages of the transcript and exhibits have been omitted where not essential.

Gregor to Mrs. McGregor ('D-9') stated 'I'm enclosing my will as per Speedy's outline'. So, we know that on or shortly before July 28, 1943, Mr. McGregor executed the will, form of which was prepared by Mr. Cavanaugh, in which Mrs. McGregor was named as the sole beneficiary, with the provision that should she die before he did, his estate was to be divided between his mother, brother and sister and her brothers and sisters." [3]

"The reading of these letters, as well as others appearing in the record, also indicated a very great devotion of this man for his wife all during the period, and is a circumstance to be considered when deciding whether it was probable or improbable that he would change his will, within four months, by reducing the amount she was to receive from his estate, to the extent of $75,000, the amount these plaintiffs claim they were bequeathed in the alleged lost or destroyed will of November 30, 1943. The correspondence passing between them also shows his desire to have her with him at all times he was in the Service of his Country, at the several stations at which he served. She joined him at his station in Rhode Island. He was transferred to Gulfport, Mississippi, October 1, 1943, and she joined him there November 15, 1943, and remained with him until March 2, 1944, except for two or three days when he was on maneuvers on an island. Their Negro maid, Bessie Williams Owens, who worked for the couple, testified that they had no trouble that she knew anything about and they 'got along lovely'. The Court believes it is justified in saying that, basing its conclusion on the human experiences of life, colored maids usually know what goes on in any family with which they may be connected and had there been any discord between this man and his wife, Bessie probably would have known it.

"But, contend the plaintiffs, Mr. McGregor did make another will on November 30, 1943, while he was stationed at Gulfport, Mississippi, and while Mrs. McGregor was there with him. It is this will that plaintiffs claim was read by Mrs. Davidson, in the presence of Dr. Conroy [4] and Mrs. McGregor, at her home, in Leesville, on November 28, 1949, and in which they claim to have been named as beneficiaries to the extent of $75,000.00. The surrounding circumstances leading up to the time of the

3. This is the will, as later shown in the judge's opinion, which subsequently disappeared from the McGregor safety deposit box at the Burns National Bank in Durango, Colorado. The only person, other than Mr. and Mrs. McGregor, having access to this box was Herbert McGregor.

4. Dr. John C. Conroy was a nephew of Mr. McGregor. He was attached to the Armed Forces and stationed at Fort Logan, Colorado, at the time of Mr. McGregor's death and came to Lake Charles to attend the funeral.

execution of the alleged will of November 30, 1943, did not, as they were related at the trial, and do not now, from reading the record, impress the court with the reasonableness or accuracy of plaintiffs' contentions.

"Commander McGregor, prior to his going overseas, was granted a pre-embarkation leave during which he visited in Durango, Colorado, where these plaintiffs, his brother and sister, live, from October 25, to November 11, 1943, during which period, Herbert admitted, Colin made no mention of a will, or of any change of a will. The will, executed in July, 1943, was, during Colin's visit to Durango, in Colin's safety deposit box in the Bank there. Had he, at that time, up to November 11, 1943, contemplated any change in the will executed in July, 1943, it seems reasonable to suppose that he would have, while he had personal access to the July will in the safety deposit box, then changed it. But what do we find? He returned to Gulfport on or about November 11, 1943, and his wife joined him there November 15, 1943. Herbert testified that he received a letter from Colin dated November 22, 1943 (only 11 days after Colin left Durango and only 7 days after his wife had joined him), in which a separate note was enclosed, re-questing Herbert to obtain from the deposit box and forward to him, the will deposited therein and this Herbert did within two or three days. Although it was his custom, according to Herbert, to keep all correspondence, even including personal letters from his brother, he didn't keep this one note, but destroyed it. It occurs to the Court that this note was worth keeping, notwithstanding Herbert said Colin instructed him to destroy it. He could have kept it from being seen by another. It was important, by way of authority to Herbert to enter Colin's personal safety deposit box and extract therefrom so important a document as a will. It is significant, too, that plaintiffs did not offer the bank's records to prove that Herbert did enter the box shortly after November 22, 1943, nor make any explanation of their failure to do so. Defendant was not charged with the duty of offering those records in refutation of the testimony, because she had no way of knowing that Herbert would so testify, and there was no time thereafter to obtain the records from the bank in Colorado. Herbert testified that he received another letter from Colin, dated December 6, 1943 [5] in which there was another separate note and an envelope saying that it contained Colin's will and requesting Herbert to keep the will until

5. This letter, as well as the one from Colin McGregor dated November 22, 1943, was produced by Herbert McGregor. The contents of these letters disclose that they are casual filial missives, no ref-erence being made therein to the special instruction regarding Colin's will which Herbert says were contained in the separate notes later destroyed by Herbert, allegedly at Colin's request.

Colin called for it. Herbert explained that the reason the letter, itself, made no mention of the will, was because it was the custom, when any member of the family received a letter from Colin, to pass the letter around so that each member of the family could read it. That testimony of Herbert's did not impress the Court as to its accuracy, for the reason that the supposed will was enclosed in a separate sealed envelope, so that neither Herbert, nor anybody else could see it, without opening that envelope, and the letter, even though it had contained direction as to keeping the will, would not have disclosed to any other member of the family, any more than it did to Herbert, the contents of the will.

"To believe Herbert's testimony on this point, the Court would have to believe that Colin intended that no one, except Herbert, not even Mrs. McGregor, was to know that he, Colin, had executed another will. Let us bear in mind that Mr. McGregor and his wife had, shortly before, made reciprocal wills, that is they had willed to each other their respective shares in their community property. There is nothing in the record to indicate that Mr. McGregor was the kind of person who would induce his wife to make a will to him, leaving all of her property to him, and he, at the same time, will all of his property to her, and then, only four short months thereafter, without letting his wife know anything about it, make another will reducing his bequest to her by

$75,000.00. If this Court should believe Herbert McGregor's testimony on this point, it would have to believe that Colin McGregor was guilty of a moral fraud practiced upon his wife, to whom, from his letters, he appeared to be very devoted. December 6, 1943, was the wedding anniversary of Mr. and Mrs. McGregor. They were together in Gulfport on that date and he was ready to go overseas. It is unreasonable to believe, and the Court does not believe, that under the circumstances hereinabove related, this man would have committed such a moral fraud against his wife to whom he was so obviously devoted, as to have, on that very date, executed the supposed will in which he deprived her of $75,000.00 and, at the same time, let her continue her will to him, in which he was to receive all of her part of the property.

"The Court was not greatly impressed by the testimony of Herbert McGregor as to the condition of the seals on the envelopes in which he allegedly sent the alleged lost or destroyed will to Mrs. McGregor and which Mrs. Davidson testified was received by Mrs. McGregor and read aloud by Mrs. Davidson on the morning of November 28, 1949. On his direct examination he had testified that the packet he mailed to Mrs. McGregor after Colin's death contained the same large envelope into which he had placed the small envelope supposedly containing the will Colin had sent him in the letter of December 6, 1943;

that the seal on the large envelope had been broken, but the seal on the small envelope containing the will, which seal he had affixed, was 'still the same' and was 'unbroken' and said there was no doubt about it. In Herbert's letter of November 28th, 1949 to Mrs. McGregor, referring to additional search he had made for Colin's will, among other things, he said:

" 'While Colin was in camp in Louisiana shortly before he left for overseas he sent me a sealed envelope which he said contained his will, and he instructed me to seal it and keep it with his papers. I supposed that there was only one paper in the envelope judging by its size and thickness. I put it in a large document envelope and sealed it with sealing wax and labeled it "Will of Colin McGregor". That document envelope was with the papers I sent you the other day, but it appeared to me that the seals had been broken. Of course Colin has had it in his possession, or at least in the safety deposit box where he had access to it, ever since his return here in 1945, so he must have made some changes. Whether he changed his will or re-examined it, there is no way of knowing. He never mentioned it to me again.'

"Notwithstanding that he was so positive in his direct testimony that the seal on the small envelope had not been broken when he sent it to Mrs. McGregor, when he was confronted with the statements contained in the above quoted paragraph of his letter of November 28th, 1949, he found no apparent difficulty admitting that the seal on the small envelope could also have been broken, and that Colin may have reopened and reexamined (and, of course, re-written it) it. Neither Herbert McGregor, nor Mrs. Davidson, seemed to the Court to be too much concerned about the accuracy of their statements made under oath. The discrepancy last above mentioned is one illustration, and their affidavit made to the amended petition wherein they swore upon 'information and belief', that the alleged will was dated November 30, 1943, whereas, they admittedly had no information, from any source, that the will was so dated, is another illustration.

"We next consider the facts relating to the alleged execution of the will allegedly lost or destroyed, its alleged receipt by Mrs. McGregor on the morning of November 28, 1949 and circumstances, based on subsequent happenings, that could lead to a conclusion as to whether such a will was ever actually executed or ever had any existence.

"Plaintiffs caused the deposition of two different witnesses to be taken to prove that Mr. McGregor did execute a will in the latter part of November or in the early part of December, 1943, while he, as a Naval Commander, was stationed at Gulf-

port, Mississippi, namely Clifton L. Tate, Dallas, Texas, and Teddy V. Rouse of Saint Louis, Missouri. Before propounding cross interrogatories to these witnesses, defendant reserved the right to object to the introduction of any answers as being inadmissible on any ground and particularly as parol evidence, hearsay evidence and on the basis of irrelevancy. When the depositions were offered by plaintiffs defendant objected to their introduction in evidence on the ground 'that the same will purport to establish the making of an olographic last will and testament by parol evidence, and further on the ground that * * * proof of any olographic testament can only be made by witnesses appearing before the Judge who would satisfy himself of the knowledge of the witnesses as to the handwriting * * *' etc. The Court admitted the depositions, subject to the objections, and reserved the right to rule on their admissibility until passing on the case.

■ "As has already been pointed out, in order ever to prove a lost or destroyed will, it is necessary to use secondary evidence. Thomas v. Thomas, (2 La. [166]) and Succession of Daniel Clark (11 La.Ann. 124).[6] The Court believes that these depositions are admissible, for the purpose, if for no other reason, of proving, if they contain such a proof, a circumstance (the execution of a will at about the time plaintiffs

claim the alleged lost will was executed) tending to corroborate the testimony of Mrs. Davidson that such a will subsequently, on November 28, 1949, actually existed. Without discussing the numerous authorities cited by counsel for plaintiffs which they contend support their contention that the depositions are admissible, the Court overrules the objection to their admissibility and holds that they are admissible for whatever weight they may have.

"The Court attributes no value whatever to either of these depositions. In the Rouse deposition the witness precedes every answer on a material point with the qualifying phrase 'To the best of my knowledge'. He admits that he did not read the will 'in detail' which he says he saw. He couldn't recall the exact date, other than it was in November or December 1943. It was only to the 'best of my knowledge' that any such will was executed by Commander McGregor at Gulfport, Mississippi, and signed by him. He recalled nothing about who were legatees or any bequests in the will. The value of the Tate deposition is even less, if possible, than is Rouse's. (Note: Notice of the taking of the Rouse deposition is attached to the front of the Tate deposition.) Tate said he saw no will. All he knew about it is summed up in his answer to Interrogatory No. 14, when he said that in the latter part of November or early December, 1943, Commander Mc-

6. Citations in parentheses ours.

Gregor asked him if he had executed a will or power of attorney, and said that he, the Commander, had prepared one and thought all of his officers should do likewise and so thereafter advised his officers at a meeting. Nothing was said about when the Commander had prepared his will. We know he had prepared one in July, 1943, after he went into the Service. It could as well have been his July, 1943, will to which he referred, when he advised this witness and his other officers, that he had prepared a will.

"Another small, but perhaps, significant fact in connection with the Rouse deposition is that he testified that 'to the best of his knowledge' he and some other, whose name he didn't recall, signed a will for Commander McGregor at Gulfport, *as witnesses*. Commander McGregor had had Mr. Cavanaugh prepare a form of will, which the Commander executed in July before. The form of will, which he had at one time copied, did not have witnesses. If we are to believe Herbert when he said he had sent his brother that will Colin must have had it before him when he is supposed to have made the will of November 30th, and it is reasonable to believe he would have followed a form which he knew to be legally correct.

"The testimony of the two witnesses, taken by deposition as this Court views it, is without effect and without any possible value.

"The next link in the chain of facts, as presented by plaintiffs, is the alleged receipt by Mrs. McGregor of the lost or destroyed will on the morning of November 28, 1949, and its reading by Mrs. Davidson, at that time, all as testified by the latter and denied by the former. The testimony of Mrs. Davidson and Mrs. McGregor concerning the receipt and reading of the document that the former contended was a will and the latter contended was a letter from her to her husband, cannot be reconciled. There is no gainsaying the fact that one or the other testified falsely. The unpleasant, but not too difficult, task of deciding who told the truth rests squarely upon the shoulders of the trial Judge.

"There were four people in the house when the packet, sent to Mrs. McGregor by Herbert, containing the document (and other papers) whether will or letter, was delivered by the mail man to the McGregor house in Leesville, on the morning of November 28, 1949, namely, Mrs. McGregor, Mrs. Davidson, Dr. Conroy, and the colored maid, Bessie Williams Owens. The packet was received by the maid, brought into the house and delivered to Mrs. McGregor. The dispute is as to what happened immediately thereafter.

"According to Mrs. McGregor there were three wills in the packet, two of her own and one of Colin's, the one dated August 16, 1929, and probated in Probate Proceedings No. 1949. She said that, in going through the contents of the packet,

she discovered a letter she had written to her husband when they were discussing, by correspondence, the preparation of their wills to each other, early in 1943, in which letter she had suggested to her husband that he leave Herbert $50,000.00 and Mrs. Davidson $25,000.00 (to which suggestion, immediately, he had replied 'No'), and when she saw what the letter was she exclaimed 'What in the hell is my letter doing in here and where's Colin's will', referring to the one she knew he had executed in July, 1943, and she then handed the letter to Mrs. Davidson. According to Mrs. Mc-Gregor, Mrs. Davidson read at least a part of the letter out loud and handed it back to her, and she put it on the desk in the room, from which it disappeared and she has never seen it since. Each of the three who saw the document, will or letter, Mrs. McGregor, Mrs. Davidson and Dr. Conroy, agree that the letter was placed on the desk and each one says he or she never saw it again. The testimony of Mrs. McGregor leaves the inference that the document was taken from the desk by Mrs. Davidson or Dr. Conroy, who left shortly after the incident, while theirs leaves the inference that it was done away with by Mrs. Mc-Gregor, in whose possession they say it was left. As this Court sees it, either one of the three had equal opportunity to take the document and at least Mrs. Davidson and Mrs. McGregor had equal possible motive. Even the colored maid, perhaps, could be said to have had the opportunity to take it, but would have no motive. If, in fact, it was only a letter, as Mrs. Mc-Gregor contends, Mrs. Davidson might have had one of two objects in taking it. If she had then decided to contend it was a will, she, of course, would not have wanted the letter to remain in Mrs. Mc-Gregor's possession, or, perhaps, she could have thought that, since Mrs. McGregor, in early 1943, requested Colin to give her and Herbert $75,000.00 she might be persuaded, by the use of that letter, to, herself, make such gifts. On the other hand, if it was a will bequeathing this amount to the brother and sister, and Mrs. Mc-Gregor had changed her mind and didn't want them to have it, then, of course, Mrs. McGregor had motive to destroy it. The Court draws no inference from the loss of the document, to the extent of convicting either of taking or destroying it, and certainly it will not presume, on the basis of the evidence offered, that Mrs. Mc-Gregor was in possession of a will in which these plaintiffs appeared as legatees and presume that she destroyed that will, and thereby create certain presumptions against her, as the spoilator of the will, so as to minimize the proof necessary to probate it.[7]

7. We express no opinion here (as none is necessary) respecting the applicability of the maxim "omnia praesumuntur contra spoiliatorem" (all things are pre-

"Mrs. Davidson, who has long worked in an abstract office and is familiar with wills, testified that the document Mrs. McGregor handed her to read, on the morning of November 28, 1949, was a will, entirely written, dated and signed by her brother, Colin. She said she read the entire will aloud, in the presence of Mrs. McGregor and Dr. Conroy. Mrs. Davidson testified as to the substance of the will she says she read, giving $50,000 to Herbert and $25,000 to her, and the balance of the estate to Mrs. McGregor, and explaining why he was leaving less to Mrs. Davidson than to her brother, Herbert. She said, 'And it was dated, and given under my hand and seal, this day—*this blank day of November, 1943,* and signed Colin McGregor'. (Emphasis supplied.) She had previously testified that the will had a certain date in November, but as to the exact day she said, 'I'm not sure, but it *seems like it might have been the 30th.'* (Emphasis added.)

"Although it had been more than five years since Mrs. Davidson says she saw and read the will, she was, nevertheless, able to quote the principal part of it, except the date, almost verbatim, as it is written in Article 8 of the original petition. The Court's credulity is not sufficiently strong to believe she could do that after so long a time and never having seen it but the one time.

"Both Mrs. Davidson and Dr. Conroy testified that the latter was present in the room when Mrs. Davidson read the document out loud, but Mrs. McGregor disputes this, saying Dr. Conroy was in the kitchen having his breakfast. Mrs. McGregor is, to some extent, corroborated by the maid, Bessie, who testified that when Mrs. McGregor made the exclamation 'What in the hell is my letter doing in here', etc., Dr. Conroy was in the kitchen eating his breakfast, and it was immediately after Mrs. McGregor saw the letter that she handed it to Mrs. Davidson to read.

"The testimony of Dr. Conroy as to what he heard Mrs. Davidson read from the document was first ruled out on the ground that it would be hearsay, but later admitted, for the restricted purpose of contradicting Mrs. McGregor's testimony as to what Mrs. Davidson read aloud. Counsel for plaintiffs, in their briefs, vigorously disagree with the court's ruling in

sumed against a despoiler or wrong-doer) in cases involving lost or destroyed wills in Louisiana. While it is generally accepted that the rules of evidence established at common law will be applied in civil cases in this State (see Dranguet v. Prudhomme, 3 La. 83), it may well be doubted that the validity of a lost or destroyed will can be presumed, even against a suppressor, and stand in lieu of secondary evidence showing its legality as to form and substance. In the only will case in Louisiana wherein this common law maxim was invoked, Lucas v. Brooks, 23 La.Ann. 117, the majority opinion found it unnecessary (as we do here) to decide its applicability under the facts of the case.

this respect, but it must be adhered to. However, even if it be considered in proof of the existence of the will and its contents, it will not avail plaintiffs in view of the conclusion the Court has reached on the facts of the case, for the Court believes, for the reasons hereinafter pointed out, that most of what Dr. Conroy testified was not from his own independent recollection of what happened, but rather from what Mrs. Davidson told him happened on the occasion in question.

"Mrs. Davidson further testified that after she read the document aloud, in Dr. Conroy's presence, she handed it to him, he glanced at it and said it was 'Colin's handwriting and that was his signature'. She said Dr. Conroy handed it back to Mrs. McGregor and 'we discussed the will in general and we were all surprised at the contents of it'.

"Dr. Conroy's testimony was wholly unsatisfactory. In fact, in the Court's notations, made at the time, it is commented that the Doctor seemed to be in a daze. He didn't seem to know anything for certain. When he testified first he said he heard Mrs. Davidson read the document aloud; that they were in the same room and only a short distance apart; that he saw the document and it was in Colin's handwriting, or what he saw of it was in that handwriting; that he did not read it entirely, and did not read enough to say what bequests were made, but from what was read to him could tell what they were (97) and at page 232, he said what she read sounded like a will and left $50,000.00 to Herbert and $25,000.00 to Mrs. Davidson. He didn't recall seeing the signature (101) and he didn't *think* it was a letter, didn't *think* any part of it was written by Mrs. McGregor, didn't recall any of the language from looking at it (100). It seems to the Court much more reasonable to believe that, had this nephew just heard read a document purporting to leave to his uncle $50,000.00 and to his aunt, $25,000.00, and the instrument had been handed to him to read, he would have read it. He didn't recall making any remark after reading it (101), and at page 105 he couldn't recall what kind or size of paper the document was written on, legal size or tablet, nor whether it was a letter-head or plain paper. At page 233, in relating what Mrs. Davidson read, Dr. Conroy said she first read the date, whereas, she had said that the date was at the end of the will. He couldn't remember the date other than he believed it to be some time in November, but did not say anything about the year. It appeared to the Court that after each time Dr. Conroy had an opportunity to talk to Mrs. Davidson, he could thereafter remember a little more of the transaction.

"As has been pointed out, in a little while after the alleged reading of the document at the McGregor home on the morning of November 28, 1949, Mrs. Davidson

and Dr. Conroy left by car to go to Lake Charles to catch a plane on their return to their home in Colorado. Mrs. Davidson stopped in Denver for two days, attending a convention of abstractors there. She reached Durango, the home of her and her brother, Herbert, on December 1, 1949, and on the same day she told her brother about the bequest of $50,000.00 to him and $25,000.00 to herself. Can anybody possibly believe that Mrs. Davidson would not, had she known her brother had been given $50,000.00 plus his $6,000.00 note, have telephoned him, during her two days stay in Denver, informing him of his good fortune? It is in evidence that neither Herbert nor his sister were affluent. $50,000.00 meant much to him. As he said, if he had his debts paid and had $10,000.00 he would feel rich, since he never expected to have that much. This Court is confident that had his sister known, on November 28th, 1949, that her brother had been bequeathed $50,000.00, she would have apprised him of that fact before December 1st.

"After Mrs. McGregor's failure to find, in the packet sent to her by Herbert, and received by her on the morning of November 28, 1949, the will Colin had executed in July, 1943, form of which Mr. Cavanaugh had prepared, she called Herbert and asked him to make further search for it. In the letter of November 28th, 1949, from Herbert to Mrs. McGregor, he advised her he had been unable to find any

other will and in that letter told her about Colin having sent a will from Gulfport, shortly before going overseas, and in that letter also, after calling attention to the fact that Colin had access to it ever since he came back there in 1945, said that the seals appeared to have been broken, although he had testified, until presented with this letter, that they had not been broken. What Mrs. McGregor was looking for, as the Court understands the evidence, was the missing will of July, 1943, the one reciprocating the bequests made to him by his wife. If, in fact, he had executed another will, dated in November, 1943, leaving Herbert and Augusta $75,000.00, as they contend, the July 1943 will would have been of no importance, whatever, and it is unreasonable to believe that Mrs. McGregor would have been interested in finding it. Significant, also, is the fact that in the letter of November 28, 1949, Herbert said nothing about any later will which appeared in the packet sent Mrs. McGregor. If there had been such a will, read by Mrs. Davidson, on the very day that the letter was written, and Mrs. McGregor having previously telephoned him to make further search, does it not stand to reason that Mrs. McGregor would have mentioned it to Herbert. She couldn't hope to conceal the fact, even if she desired to do so, since, according to Mrs. Davidson, she had read it and according to Dr. Conroy he had heard her read it. It would have been

a vain and senseless thing, indeed, for her to have continued to try to find the July, 1943, will, had she known as plaintiffs contend, that a later will existed and that Augusta and Dr. Conroy had seen it.

"But, argue plaintiffs' counsel, Mrs. McGregor thereafter tacitly admitted the existence of the November, 1943 will by offering to accept a 'waiver' offered by Herbert and Augusta of any rights they had under that will. The contention that Herbert and Augusta offered to 'waive' and Mrs. McGregor accepted the offer, is based principally upon (1) Herbert's letter to Mrs. McGregor dated December 7, 1949 in which he refers to the will which Augusta had told him she saw and read on November 28, 1949. In that letter, he said 'So if you file that in probate have your lawyer send me a waiver and I will relinquish any claims indicated by the mention of my name in the will'. He said, 'I will not accept any such bequest, nor will Augusta; we will waive that if necessary', (2) upon what they contend was her reply, in the form of a telegram, under date of December 13, 1949, sent to Herbert by Mrs. McGregor and reading as follows:

"'You are a pal and above all you are honest you shall never regret it. Don't feel like writing just now. Love. Lillie'.

and (3) upon a letter from Augusta to Mrs. McGregor dated December 27, 1949, excerpt from which reads as follows:

"'Herbert told you we would waive everything in the will and I wondered if you wanted a statement typed to that effect and we could both sign it? Of course whatever you want we want to do—you know that.'

and (4) letter written by Mrs. McGregor to Herbert dated February 11, 1950, excerpt from which reads as follows:

"'When we get ready to go into this you and Augusta can have a waiver written, not that I don't trust you, but there I go again sticking to details—I would trust you, Herb, with anything I own including my life but things should be done right—After we get the waiver and stuff I will send you the notes I hold—.'

"Counsel quote from the testimony of Mrs. McGregor as follows:

"'Q. Can you say now, Mrs. McGregor, why you made the statement that you made in that telegram? A.

Yes. Because after Augusta told him I had received that letter, I know that she was dishonest, that's why I sent him that telegram. Because I figured he was honest.

"'Q. And that was your reason for sending the telegram? A. That's exactly the reason.'

"It was obvious to Mrs. McGregor, from Herbert's letter of December 7, 1949, that

Augusta had told Herbert that she had read a will in which they were left bequests. She had, just previous to the testimony quoted above been testifying about the letter of December 7, 1949, and the Court thought when Mrs. McGregor testified, as quoted above that she intended by her testimony to convey the thought that Augusta was dishonest because she had told Herbert, as evidenced by Herbert's letter, that she had read a will containing bequests to them. This illustrates the difference in impressions gained from hearing the testimony, as it falls from the lips of a witness, and that gained from reading the cold writing of the same words.

"The first suggestion of 'waiver' came from Herbert, and there was never any indication, by any act or word of or from Mrs. McGregor, that she was concerned with or intended to present for probate the alleged will of November 30, 1943. In the letter of February 11, 1950, she said to Herbert that he and Augusta could have a waiver written and 'after we get the waiver and stuff I will send you the notes I hold' and said 'I'm saving a car for you'. Mrs. McGregor said that what she meant by the word 'waiver' as used in the letter was 'receipt', and the Court believes that is what she did mean, because she testified that she had understood that it would take a year before the estate could be wound up be-

cause it would be that long before the Federal Estate taxes would be settled and further, if Augusta came after the car, and Mrs. McGregor was gone, Mr. Wooten [8] (who is a tax accountant to the court's knowledge) would let her have the car, and this is what did happen. We all know, of course, that it is not safe to dispose of any part of an estate as large as this until clearance on the Estate tax is obtained. Moreover, appealing again to reason and common sense and some knowledge of human nature, the Court cannot believe that anybody, under the same circumstances, where $75,000.00 was involved, and the two persons who were to receive that sum, offered to waive their rights, would not have hurried to accept and secure, in writing, that waiver, but Mrs. McGregor never even talked to her lawyer about it.

"Plaintiffs say that the reason they offered to waive their legacies, and then changed their minds, was because they were led to believe by Mrs. McGregor that the cash position of the Estate was not good and then when they found out the contrary, they thought she had not treated them right. That position is absurd. From the testimony, both Herbert and Augusta knew the approximate value of the Estate. She testified that she knew Colin owned several apartment houses in Lake Charles, owned some lots, and some $90,000.00 in

8. One of defendant's attorneys at that time.

Government bonds, owned a ranch in Colorado worth from $100,000.00 to $150,000.00. She also knew that she owed him a $2,000.00 note and Herbert owed one for $6,000.00. Nor is it true, as they said, that they offered the waiver because they thought the 'cash' position of the Estate was not good, and then changed their minds when they found out it was in good position. As a matter of fact, the inventory in the probate proceedings, No. 1949, shows total cash on hand in the several banks aggregating $29,207.56, and according to the petition in those proceedings, there were some debts due by the estate, but how much the Court is not informed. However, considering the total value of the estate, on which Federal Estate taxes had to be paid, there could not have been, as a matter of fact, a considerable amount of cash balance left, even if we don't consider any debts. So, it follows, that plaintiffs explanation of this apparent discrepancy in their testimony is about as unconvincing as some of the other parts of it.

"Another point that is to the Court significant is the fact that Mrs. Davidson came to Louisiana in September, 1950, and got the car Mrs. McGregor had given Herbert, but never at that time made any investigation of how far the settlement of the estate had progressed. In fact, both she and Herbert testified they didn't know a will had been probated until the early part of 1951. Mrs. Davidson is and has been, for many years, according to her testimony, an abstractor of titles, and necessarily knows her away around a courthouse and where to find out about estates. The Court does not believe that, if Mrs. Davidson, at that time, thought she had $25,000.00 and her brother had $50,000.00 coming out of this estate, she would not have gone by the Courthouse and found out about it. She knew, too, because Mrs. McGregor had written them, what lawyer she had representing her, and it would have been an easy thing to have called him and asked him 'What about my $25,000.00? When am I going to get it?'

"This Court was not convinced, at the end of the taking of the testimony, and it is no more convinced now, that Mrs. Davidson saw or read a will on the morning of November 28, 1949, dated November 30, 1943, or that Dr. Conroy heard her read such a will, and for that reason, if there was no other, plaintiffs' demands would have to be rejected."

The judgment is affirmed.